UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| Richard Tanasi and Athansula Tanasi,<br><br><div align="right">Plaintiffs,</div><br>-against-<br><br>Citimortgage, Inc. and M&T Bank, as successor by merger to Hudson City Savings Bank, N.A.,<br><br><div align="right">Defendant.</div> | Case No.:<br><br>**COMPLAINT**<br><br>**May 16, 2016** |

The Plaintiffs Richard Tanasi and Athansula Tanasi, as and for a complaint, allege as follows:

## PARTIES

1.    Plaintiff Richard Tanasi is a natural person residing at 27 Briarwood Drive, Old Saybrook, CT 06475.

2.    Plaintiff Athansula Tanasi is a natural person residing at 27 Briarwood Drive, Old Saybrook, CT 06475.

3.    Richard Tanasi and Athansula Tanasi are referred to herein individually as the "Plaintiff" or collectively as "Plaintiffs."

4.    Defendant Citimortgage, Inc. is a corporation organized and existing under the laws of New York, with its registered address at CT Corporation System, Inc., 100 South 5th Street, Suite #1075, Minneapolis, MN 55402, and its principal place of business at 1000 Technology Drive, O'Fallon, MO 63368-2240. Defendant Citimortgage, Inc. is referred to herein as the "Citimortgage."

5.      Defendant M&T Bank Corporation, as successor by merger to Hudson City Savings Bank[1] is a corporation organized and existing under the laws of New York with its registered address at Attn.: General Counsel, One M&T Plaza, 12th Fl., Buffalo, NY 14203-2399 and its principal place of business at One M&T Plaza, 19th Fl., Buffalo, NY 14203-2399. For convenience, this Defendant is referred to as "Hudson."

6.      Collectively, Citimortgage and Hudson are referred to as the "Defendants."


**JURISDICTION**

7.      This Court has jurisdiction pursuant to 28 U.S.C. §1331 as this action arises under the Dodd-Frank Wall Street Reform and Consumer Protection Act (DFA), the Real Estate Settlement Procedures Act, 12 U.S.C. §§ 2601, *et seq.* (RESPA), and the Truth in Lending Act, 15 U.S.C. §§ 1601, *et seq.* (TILA).

8.      This Court has supplemental jurisdiction to hear any and all state law claims pursuant to 28 U.S.C. § 1367.

9.      This Court also has diversity jurisdiction over the parties pursuant to 28 U.S.C. 1332 as the Parties are citizens of diverse states and the amount in controversy exceeds $75,000.


**VENUE**

10.      Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2) as substantially all of the events or omissions giving rise to this action occurred in this district.

---

[1] After approximately three years of delay, the entities finally merged on November 1, 2015.

## NATURE OF CASE

11.     This is an action brought to redress violations of the mortgage servicing

regulations as promulgated by the Consumer Finance Protection Bureau under RESPA and the

DFA, as well as for violations of the Connecticut Unfair Trade Practices Act ("CUTPA"), the

Connecticut Creditors' Collection Practices Act ("CCCPA"), and Connecticut state tort law. This

case is not brought to enforce any substantive loss mitigation[2] option that could have been

offered by the Defendants, but rather to enforce the Plaintiffs' procedural rights under federal

and state law.

12.     In January of 2013, the CFPB issued a number of final rules concerning mortgage

markets in the United States, pursuant to the DFA. Specifically, on January 17, 2013, the CFPB

issued the RESPA (Regulation X) and TILA (Regulation Z) Mortgage Servicing Final Rules, 78

F.R. 10901 (February 14, 2013) and 78 F.R. 10695 (Regulation X) (February 14, 2013), which

became effective on January 10, 2014.

13.     The events that gave rise to this complaint concern the Plaintiffs' residence, 27

Briarwood Drive, Old Saybrook, CT 06475 (the "Property"). The Property is encumbered by a

first-position mortgage loan in the principal amount of $656,250 (the "Mortgage") dated August

2, 2007, given as security for a promissory note of even-date, and recorded on August 6, 2007.

The Mortgage was a construction loan originally underwritten by ABN AMRO. Upon

information and belief, Citimortgage purchased the loan after it had been sold or otherwise

transferred to Wachovia Savings Bank. Citimortgage sold the Mortgage to Hudson on or about

November 27, 2007, but retained the servicing rights to the Mortgage.

---

[2] Defined *infra*.

14.     The Loan in the instant matter is a "federally related mortgage loan" as said term is defined by 12 C.F.R. § 1024.2(b).

15.     Citimortgage is subject to Regulation X and Z and does not qualify for the exception for "small servicers", as such term is defined in 12 C.F.R. §1026.41(e)(4), nor for the exemption for a "qualified lender", as such term is defined in 12 C.F.R. §617.700. The Plaintiffs are not in an active bankruptcy case under Title 11 of the United States Code, and the Mortgage has not been discharged. *See* 12 CFR § 1024.35(g)(1)(iii)(B); 12 CFR § 1024.39(d)(1).

16.     Plaintiffs are asserting a claim for relief against Defendants for breach of specific rules under Regulation X, Z, and related state law.

17.     Plaintiff has a private right of action under RESPA pursuant to 12 U.S.C. §2605(f). Damages include actual damages, costs, statutory damages, and attorneys' fees.

18.     Plaintiff also has a private right of action for related claims under Connecticut State law, including CUTPA, the CCCPA, and state tort law. Damages include actual damages, costs, statutory damages, and attorneys' fees in an amount to be determined at trial but in excess of $75,000.

## STATEMENT OF FACTS

**I.     The loss mitigation efforts of the Parties.**

     *A.     Introduction.*

19.     After the foreclosure crisis, state and federal governments undertook a massive effort to encourage mortgage servicers to develop solutions to keep borrowers in their homes. The efforts were also intended to protect borrowers' procedural rights, as borrowers in default or foreclosure are uniquely at risk of abuse by mortgage servicers. These efforts included the

National Mortgage Settlement reached by the U.S. Attorney and 49 states' attorneys general with a number of large banks including Citimortgage, the passage of mortgage servicing rules under RESPA and TILA, and the enactment of efforts at the state and local level to provide for mediation and settlement of foreclosure cases.

**B.    *Loss mitigation submissions and review prior to the effective date of Regulation X.***

20.    Loss mitigation efforts of the parties prior to the effective date of Regulation X are not subject to the regulation, but are subject to substantive state law. The effective date was January 10, 2014.

21.    The Plaintiffs have been engaged in loss mitigation efforts with Citimortgage continuously since 2009. The Plaintiffs were first solicited for loss mitigation options by letter from Citimortgage on June 17, 2009.

22.    Originally *pro se*, the Plaintiffs applied for a mortgage modification in response to that letter. However, the first mortgage application was denied on November 27, 2009 because, per Citimortgage, a mortgage modification is not allowed. On December 1, 2009, a follow up denial was provided by Citimortgage that stated the Plaintiffs' income exceeded the allowable amount under HAMP and that they had poor credit. A second mortgage application was denied for the same reasons on October 6, 2010 and again on November 14, 2010.

23.    On January 25, 2011, despite its earlier denials, Citimortgage sent the Plaintiffs a solicitation package containing a mortgage modification application. As would become clear, the process of requesting a mortgage modification application, or sending letters that stated "We can help," and then denying the application would be repeated over and over and over, with great emotional trauma to the Plaintiffs occurring as a result.

24.     A foreclosure action was commenced on July 18, 2011.

25.     On February 10, 2012 this office submitted a mortgage modification application on behalf of the Plaintiffs. Receipt was not acknowledged by Citimortgage until March 7, 2012. The March 7 acknowledgement also contained a request for additional documents. Citimortgage responded on April 3, 2012. Plaintiffs then received another missing document letter, to which they responded on April 7, 2013. On May 10, 2012, the Plaintiffs were denied for a mortgage modification.[3]

26.     Subsequently, on June 7, 2012, Citimortgage solicited the Plaintiffs for a new mortgage modification application.

27.     In response, on November 2, 2012, another new loss mitigation application was emailed to Citimortgage.

**C.     *Loss mitigation submissions and review after the effective date of Regulation X.***

28.     On January 7, 2014 the Plaintiffs re-applied for a mortgage modification based on the repeated solicitation packages being sent by Citimortgage.[4]

29.     On March 19, 2014, Citimortgage requested a new 4506-T, hardship affidavit, bank statements, paystubs, Home Owner's Association statement,[5] Dodd-Frank certification, mortgage statement for the rental property, business expenses, and an explanation of the Plaintiff's pension.

---

[3] As described *infra*, Citimortgage did not actually review the Plaintiff. Rather, it generated form denials based on 'investor restrictions.' However, the denials turn out to be less-than-accurate.

[4] Citimortgage only has an obligation to comply with Regulation X for one loss mitigation application. 12 CFR § 1024.41(i). However, the prior loss mitigation activity was performed prior to the effective date of Regulation X. The effective date was January 10, 2014.

[5] Citimortgage had already been informed that this did not apply.

30.     On April 11, 2014, Citimortgage requested that paystubs be re-sent because they were 'blurry,' a copy of the mortgage statement for the rental property, a different 4506-T, and a different hardship affidavit form.

31.     The requested documents were sent on April 29, 2014.

32.     On May 14, 2014, Citimortgage requested the Plaintiffs' 2014 pension statement, bank statements, pay stubs, and the Plaintiff's 2013 tax return.

33.     On July 1, 2014, Citimortgage sent a new "CitiMortgage Workable Solutions Application" that it requested the Plaintiffs complete.

34.     Updated financial documents were sent on July 3, 2014 in response to the May 14, 2014 request. A new workout package was sent on July 10, 2014 in response to the July 1, 2014 request.

35.     A missing document letter dated July 22, 2014 was sent by Citimortgage requesting more bank statements, additional paystubs, additional pension stubs, their insurance declaration sheet, their 2014 property tax bill, and another hardship affidavit. The Plaintiffs responded on August 1, 2014.

36.     Another missing document letter dated August 27, 2014 was sent requesting additional bank statements and an updated hardship letter. The Plaintiffs sent a response on September 16, 2014.

37.     A missing document letter dated October 25, 2014, and the Plaintiffs provided the documents requested on November 3, 2014. The Plaintiffs made a final submission on November 17, 2014, and Citimortgage sent letters dated November 20 and November 24, 2014 that indicated it was reviewing the submissions.[6]

---

[6] As described *infra*, in order to avoid their modification review obligations, it appears that Citimortgage was submitting a missing document letter to the Plaintiffs every 30 days, without regard for whether the modification

38.     On November 28, 2014, Plaintiff Athansula Tanasi did a phone intake for a mortgage modification with Citimortgage. Citimortgages's representative informed the Plaintiff that she was 'pre-qualified,' subject to the submission of some missing documents. Citimortgage provided an email on December 4, 2014 explaining what documents were still missing, and the Plaintiffs provided the documents on December 9, 2014.

39.     The Plaintiffs provided a response to the latest missing document letter on January 13, 2015.

40.     Citimortgage sent a denial letter dated February 12, 2015, but it was not actually sent to the Plaintiffs or their counsel. They received it on March 12, 2015 and submitted an appeal on March 12, 2015.[7] The denial letter only indicated that the Plaintiffs were not eligible for the HAFA program. No review was done for an actual home-retention option. No response to the appeal was ever sent.

41.     Plaintiffs sent another mortgage modification application in on August 17, 2015 in response to Citimortgages's request. No response to the application was ever sent.[8]

42.     Despite its failure to respond to the modification applications, Citimortgage solicited the Plaintiffs for a mortgage modification by email and regular mail date January 28, 2016.

---

application was already complete. Following the initial submission on January 7, 2014, missing document letters were sent by Citimortgage on 3/19/14, 4/11/14, 5/11/14, 6/18/14, 7/25/14, and 10/25/14.
[7] As developed *infra*, it is both a violation of Regulation X to fail to provide for an appeals period and to fail to respond to an appeal. It was a further violation of Regulation X to have moved for a judgment of strict foreclosure prior to issuing a determination on the appeal.

[8] Again, it was a violation of Regulation X to fail to acknowledge receipt of the application, respond to it, or to move for a judgment of strict foreclosure.

> **D.**   ***Hudson's loss mitigation policy and the underlying pooling and servicing agreement.***
>
> i.   <u>Hudson's loss mitigation programs and policies.</u>

43.   At least as early as February 1, 2012, Hudson was holding itself out to the public as offering mortgage modifications. Upon information and belief, a copy of a document entitled "Mortgage Modification Program"[9] was posted to Hudson's website on or about February 1, 2012.

44.   Upon information and belief, in a 10-Q filed with the SEC in or around June of 2012, Hudson City indicated that it was adopting a completely contradictory set of loss mitigation policies. In the policy, Hudson indicated that it was going to actually review loans for a modification if the loan to value ratio ("LTV") of the loan was 95% or less.

45.   Upon information and belief, in its December 31, 2012 annual 10-K filing, Hudson announced that

> …we adopted a Loan Modification Policy that, among other things, expands the modified loan programs that were previously offered by the Bank. We began to modify loans pursuant to this policy during the **first quarter of 2012**, resulting in an increase in the amount of loans classified as troubled debt restructurings at December 31, 2012. We anticipate that as we continue to modify loans in the future, the amount of loans classified as troubled debt restructurings will increase.

46.   Upon information and belief, in its December 31, 2014 annual 10-K filing, Hudson provided the following information about its loss mitigation programs:[10]

> Non-performing loans exclude troubled debt restructurings that are accruing and have been performing in accordance with the terms of their restructure agreement for at least

---

[9] The loss mitigation guidelines at the time appeared to prohibit modification of delinquent loans. The document has a footnote that indicates "Revised 2/08."

[10] Hudson provided similar information in its December 31, 2013 annual 10-K filing. As the data above is the same as would have been reflected on the 2013 10-K, that information is omitted.

six months. The following table presents information regarding loans modified in a troubled debt restructuring:

| | December 31, | | | | |
|---|---|---|---|---|---|
| | **2014** | **2013** | **2012** | **2011** | **2010** |
| | (In thousands) | | | | |
| Troubled debt restructurings: | | | | | |
| Current | $ 137,249 | $ 108,413 | $ 64,438 | $ 43,042 | $ 9,429 |
| 30-59 days | 20,344 | 19,931 | 28,988 | 7,359 | 1,616 |
| 60-89 days | 17,079 | 17,407 | 14,346 | 4,786 | — |
| 90 days or more | 157,744 | 176,797 | 107,320 | 11,354 | — |
| Total troubled debt restructurings | $ 332,416 | $ 322,548 | $ 215,092 | $ 66,541 | $ 11,045 |

The increases in troubled debt restructurings since 2010 were primarily due to an expansion of loan modification programs offered by the Bank pursuant to a Residential Mortgage Loss Mitigation Policy that **became effective during the first quarter of 2012**.

Loans that were modified in a troubled debt restructuring primarily represent loans that have been in a deferred principal payment plan for an extended period of time, generally in excess of six months, loans that have had past due amounts capitalized as part of the loan balance, loans that have a confirmed Chapter 13 bankruptcy status, borrowers' loans that have been discharged in a Chapter 7 bankruptcy **and other repayment plans**…

\*\*\*

       ii.    <u>The Master Mortgage Loan Purchasing and Servicing Agreement dated November 26, 2007</u>.

47.    Citimortgage has informed the Plaintiffs that the servicing of the subject loan is governed by the Master Mortgage Loan Purchasing and Servicing Agreement dated November 26, 2007 (the "PSA"). Upon information and belief, Section 10.01 of the PSA permits Citimortgage to conduct discretionary mortgage modifications. That section grants Citimortgage and / or its subservicers the following authority:

…Seller[11] may waive, modify or vary any term of any Mortgage Loan or consent to the postponement of compliance with any such term or in any manner grant indulgence to any Mortgagor…

However, that provision has the important caveat that

…(**unless** the Mortgagor is in default with respect to the Mortgage Loan … **and Seller has the consent of Purchaser**) Seller shall not, **unless authorized by Purchaser**, permit any modification with respect to any Mortgage Loan that would change the Mortgage Interest Rate, defer or forgive the payment of any principal or interest, change the outstanding principal amount, including short sales/reduced sheriff sale bids, etc., (except for actual payments of principal) make any future advances or extend the final maturity date…

(emphasis added).

48.     Moreover, Section 10.07 directs Seller to "take such action as it shall deem to be in the best interest of Purchaser" … "[i]n the event that any payment due under any Mortgage Loan is not paid when the same becomes due and payable…and such failure continues beyond any applicable grace period."


**E.      *Citimortgage's obligations as mortgage servicer and review of loss mitigation submissions.***

i.      Citimortgage is a mortgage servicer regulated under RESPA, Regulation X, and the National Mortgage Settlement.

49.     Citimortgage is a mortgage servicing company that is regulated under RESPA, Regulation X, and, during the relevant period, was also subject to the National Mortgage Settlement ("NMS"). As such, it has mortgage servicing obligations that go beyond the PSA.

---

[11] Citimortgage is the "Seller."

ii.    <u>Citimortgage's failure to timely review loss</u>
       <u>mitigation applications</u>.

50.    Citimortgage failed to provide an acknowledgment notice in response to a loss

mitigation application sent on January 13, 2014. Finally, on March 7, 2014, well beyond the five

day acknowledgment period set forth under Regulation X, Citimortgage provided a response.

Citimortgage also failed to notify the Plaintiffs within five days of receipt of the January 13,

2014 loss mitigation application as to whether the application was complete or not. Finally,

Citimortgage failed to provide the Plaintiffs with an evaluation notice stating Citimortgage's

determination of what loss mitigation options were available to the Plaintiffs within 30 days of

receipt of a complete loss mitigation application.

51.    Upon information and belief, the application was facially complete at the time of

submission based on Citimortgage's document checklist.

52.    Citimortgage unreasonably requested more information from the Plaintiffs.

Requests for additional documents were sent on March 19, 2014, March 31, 2014, April 11,

2014, April 29, 2014, May 14, 2014, June 17, 2014, July 22, 2014, August 27, 2014, October 24,

2014, November 28, 2014, December 12, 2014, January 9, 2015 and January 29, 2015.

53.    Citimortgage finally denied the application in a letter dated February 12, 2015 but

failed to actually mail the denial letter to the Plaintiffs or their counsel. In the denial letter,

Citimortgage failed to provide for an appeals period, despite its obligation to do so under

Regulation X.

54.    The Plaintiffs re-applied for a modification on August 17, 2015. Citimortgage did

not respond at all to the loss mitigation application that was submitted on August 17, 2015.

iii.    Citimortgage's failure to request a waiver of
        investor restrictions.

55.    Citimortgage is a mortgage servicer that is regulated by both the mortgage servicing regulations promulgated under RESPA, 12 CFR 1041.41, and, as a result of the NMS, by the federal HAMP program and its correspondent handbook, the Making Homes Affordable ("MHA") Handbook.[12] Servicers participating in HAMP must sign Servicer Participation Agreements ("SPAs") before they are eligible.

56.    Under HAMP Guidelines, Ch II., 6.5, servicers are required to maintain evidence in the loan file showing that "the servicer made a reasonable effort to seek a waiver from the investor and whether that waiver was approved or denied."[13]

57.    Upon information and belief, Citimortgage has never requested a waiver of the investor restrictions on loan modifications, despite its obligation to do so under the NMS and the general authority provided to it under the PSA from Hudson.

iv.    Plaintiffs qualified for a mortgage modification
        under Hudson's guidelines but Citimortgage failed
        to complete a proper review.

58.    Upon information and belief, from at least December 31, 2010 until December 31, 2012, the Plaintiffs' property qualified for a modification review under the 95% LTV limit set by Hudson. However, upon information and belief, Citimortgage failed to complete a review during this period.

---

[12] Plaintiffs do not allege that a private cause of action exists under HAMP. Rather, Citimortgages's voluntary agreement to participate in HAMP and the salutary public policy it represents results in violations of the Connecticut Unfair Trade Practices Act, described *infra*.

[13] In 2012, HAMP Supplemental Directive 09-01 required servicers to use all reasonable efforts to remove investor restrictions from loan modifications.

59.     On December 15, 2011, Citimortgage provided a BPO indicating the Property was worth $895,000.[14] On December 11, 2012, Citimortgage provided a payoff that indicated $776,109 was owing and due. The target market value for the Property at this time in order to ensure a 95% LTV would have been $816,956.[15]

## II.     Requests for information and notices of error

60.     On January 13, 2014, the Plaintiffs mailed a qualified written request for information about the payoff of their loan and the holder of their note. No response was received.

61.     Upon information and belief, on or about March 5, 2015, the Plaintiffs mailed a qualified written request for information about the payoff of their loan and the holder of their note. No acknowledgment was received.

62.     On April 2, 2015, Citimortgage responded to the prior notices of error and requests for information, arguing that it was not required provide a response because the Plaintiffs were in an active bankruptcy case and the mortgage was discharged. However, the Plaintiffs bankruptcy case was closed over 3 years earlier, and was therefore inactive. Additionally, Citimortgage is presently attempting to foreclose on the mortgage, and has not offered or provided a release of the mortgage to the Plaintiffs. Therefore, the mortgage was not discharged.

63.     An additional Notice of Error was mailed to Citimortgage on July 6, 2015 and received on July 9, 2015. The errors asserted included:

---

[14] On December 11, 2013, Citimortgage filed an appraisal with the Connecticut Superior Court that indicated that the Property was worth $699,000. Upon information and belief, this second valuation was artificially low due to a lack of comparable sales. Property values declined very little from 2010 to 2016 in Old Saybrook, and by 2016 had returned to their 2010 levels.

[15] Prior to that date, the target fair market value for the property to meet the 95% LTV threshold would have been lower.

    a.  Not answering as to if the Investor participates in the HAMP program, or that the Investor was solicited to participate in HAMP

    b.  Not responding as to if the Investor participates in the FHA-HAMP program or in the National Mortgage Settlement Modification,

    c.  Not replying as to what proprietary modification programs are available

    d.  Not providing the surplus or deficit of income requirements for proprietary modifications etc

Citimortgage did not provide a response to this notice.

**III.**    **Damages suffered by the Plaintiffs.**

    *A.*    *Pecuniary losses suffered by the Plaintiffs.*

64.    The Plaintiffs suffered the following monetary damages:

    a.  Loss of equity in their home;

    b.  Tens of thousands of dollars in additional accrued interest;

    c.  All of the fees charged to their account by Citimortgage; and

    d.  Attorney fees and other professional fees and costs Plaintiffs expended.

    *B.*    *Emotional trauma experienced by the Plaintiffs.*

65.    The Plaintiffs continue to have elevated stress levels for fear of losing their home which has resulted in:

    a.  emotional strain on their family relationships;
    b.  anxiety;
    c.  loss of appetite;
    d.  eating too little;
    e.  embarrassment with family;
    f.  embarrassment with friends;

g.  embarrassment with others;
h.  fatigue;
i.  lack of concentration;
j.  guilty feelings;
k.  helpless feelings;
l.  Feelings of emptiness
m.  Feelings of Hopelessness
n.  lack of sleep;
o.  interrupted sleep
p.  insomnia
q.  lack of appetite;
r.  severe tension;
s.  depression;
t.  inconsistent work performance;
u.  confusion;
v.  fear of checking the mailbox;
w.  heart palpitations;
x.  overreaction to insignificant situations;
y.  self destructive behavior;
z.  uncontrolled, inappropriate crying spells;

## AS AND FOR A FIRST CAUSE OF ACTION
## VIOLATIONS OF RESPA AND REGULATION X

## COUNT I:
## FAILURE TO REQUEST WAIVER OF INVESTOR RESTRICTIONS OR CONDUCT REVIEW IN ACCORDANCE WITH INVESTOR GUIDELINES

66.    The Plaintiffs repeat and re-allege the allegations contained in paragraphs 1 through 65 as if fully stated herein, further allege as follows:

67.    Section 10.01 of the PSA permits Citimortgage to modify the core terms of a Mortgage Loan, but only if "authorized by" Hudson.

68.    MHA Handbook Section 6.5 requires a participating servicer to make a reasonable effort to get the investor to waive the restriction on modifications.

69.    The PSA does not strictly disallow modifications.

70.     12 CFR § 1024.41(a) permits borrower to enforce its provisions pursuant to 12 USC 2605(f).

71.     Citimortgage had an affirmative obligation to request a waiver of investor restrictions and it failed to do so.

72.     Citimortgage also failed to review the Plaintiffs for a mortgage modification in accordance with the stated policy of Hudson.

73.     Upon information and belief, the Plaintiffs qualified for a mortgage modification under both HAMP and the stated policy of Hudson.

74.     As a result, the Plaintiffs were deprived of an opportunity for a meaningful review of their financial circumstances and the potential for a mortgage modification.


**COUNT II:**
**FAILURE TO PROVIDE PLAINTIFFS WITH ACCURATE INFORMATION ABOUT**
**LOSS MITIGATION OPTIONS OR STATUS OF LOSS MITIGATION REVIEW**

75.     The Plaintiffs repeat and re-allege the allegations contained in paragraphs 1 through 74 as if fully stated herein, further allege as follows:

76.     12 CFR § 1024.40(b) requires that "[a] servicer … maintain policies and procedures reasonably designed to ensure that servicer personnel assigned to a delinquent borrower … perform the following functions:

> (1) Provide the borrower with accurate information about:
>          (i) Loss mitigation options available to the borrower from the owner or assignee of the borrower's mortgage loan;
>          (ii) Actions the borrower must take to be evaluated for such loss mitigation options, including actions the borrower must take to submit a complete loss mitigation application, as defined in §1024.41, and, if applicable, actions the borrower must take to appeal the servicer's determination to deny a borrower's loss mitigation application for any trial or permanent loan modification program offered by the servicer;

(iii) The status of any loss mitigation application that the borrower has submitted to the servicer;

*** 

(v) Applicable loss mitigation deadlines established by an owner or assignee of the borrower's mortgage loan or §1024.41.

77.     The foregoing facts establish that Citimortgage consistently failed to provide accurate information about the loss mitigation options available to the Plaintiffs, the actions the Plaintiffs had to take to be evaluated for loss mitigation options, the status of loss mitigation applications previously submitted, and any applicable loss mitigation deadlines.

78.     Citimortgage has never informed the Plaintiffs of the parameters of Hudson's loss mitigation program despite many requests for that information by the Plaintiffs.

79.     As a result of the inaccurate information provided by Citimortgage, the Plaintiffs have been unable to take alternative actions to cure their mortgage arrears, have been emotionally traumatized, and have expended significant sums on attorneys' fees based on the Citimortgage's representations that they would be considered for a mortgage modification.

**COUNT III:**
**FAILURE TO TIMELY AND ACCURATELY REVIEW LOSS MITIGATION**
**APPLICATIONS AND LOSS MITIGATION APPEALS**

80.     The Plaintiffs repeat and re-allege the allegations contained in paragraphs 1 through 79 as if fully stated herein, further allege as follows:

81.     12 CFR § 1024.41(h) requires a servicer to provide for an appeals period if a determination is made 90 days or more before a foreclosure sale.

82.     The most recent denial letter was dated February 12, 2015. The sale date is set for May 23, 2016. That date is more than 90 days from the date of the denial letter. An appeals period should have been provided.

83.     Citimortgage failed to review or respond to the appeal sent on March 12, 2015, or provide for an appeal right in violation of Regulation X.

84.     12 C.F.R. 1024.41(b) defines a complete loss mitigation application as an application wherein servicer has received all the information that the servicer requires to evaluate applications for the loss mitigation options available to a borrower.

85.     12 C.F.R. 1024.41(b) further states that a servicer shall exercise reasonable diligence in obtaining documents and information to complete a loss mitigation application.

86.     12 C.F.R. 1024.41(b)(2) provides that if a servicer receives a loss mitigation application forty-five (45) days or more before a foreclosure sale that the servicer must promptly review the application to determine whether the application is complete and notify the borrower within five (5) days whether the application is complete.

87.     Citimortgage failed to review or respond to the Plaintiffs' complete loss mitigation application sent on August 17, 2015.

88.     12 C.F.R. 1024.41(c) provides that upon a servicer's receipt of a loss mitigation application more than thirty-seven (37) days before a foreclosure sale, then, within thirty (30) days, a servicer must evaluate the borrower for all loss mitigation options available and provide written notice to the borrower stating which loss mitigation options, if any, it will offer to the borrower on behalf of the owner or assignee of the mortgage.

89.     Citimortgage obtained a law date of May 23, 2016. That date is more than 37 days after the Plaintiffs' modification application was submitted.

90.     Citimortgage waived any defense available to it under 12 CFR § 1024.41(i) by soliciting the Plaintiffs for additional workout packages.

91.      12 U.S.C. 2605(f) provides for damages for individuals in the amount of any actual damages, plus additional damages in cases of a pattern or practice of noncompliance up to $2,000. Moreover, in any successful action the Court must award costs together with reasonable attorneys fees.

92.      By failing to respond to either the appeal or the subsequent loss mitigation application, and by moving for judgment while both applications were pending, Citimortgage has violated Regulation X and the Plaintiffs have been harmed as a result.

## COUNT IV:
## FAILURE TO TIMELY RESPOND TO QUALIFIED WRITTEN REQUESTS

93.      The Plaintiffs repeat and re-allege the allegations contained in paragraphs 1 through 92 as if fully stated herein, further allege as follows:

94.      12 U.S.C. 2605(e) provides that

If any servicer of a federally related mortgage loan receives a qualified written request from the borrower (or an agent of the borrower) for information relating to the servicing of such loan, the servicer shall provide a written response acknowledging receipt of the correspondence within 5 days (excluding legal public holidays, Saturdays, and Sundays) unless the action requested is taken within such period.

95.      Citimortgage failed to respond in a timely fashion to the January 13, 2014 or October 27, 2014 Requests for Information.

96.      12 U.S.C. 2605(f) provides for damages for individuals in the amount of any actual damages, plus additional damages in cases of a pattern or practice of noncompliance up to $2,000. Moreover, in any successful action the Court must award costs together with reasonable attorneys fees.

97.     The Plaintiffs suffered harm in the form of accrued interest, escrow charges, corporate advances, and lost equity, as well as costs and fees incurred in retaining counsel to respond to the Citimortgage's solicitations, and emotional trauma.


## COUNT V:
## FAILURE TO PROVIDE DEDICATED SINGLE POINT OF CONTACT

98.     The Plaintiffs repeat and re-allege the allegations contained in paragraphs 1 through 97 as if fully stated herein, further allege as follows:

99.     Under 12 CFR § 1024.40, Citimortgage is obligated to assign a 'single point of contact' ("SPOC") to the Plaintiffs.

100.     Citimortgage first provided a single point of contact on November 11, 2014, in violation of 12 CFR § 1024.40. The single point of contact was Luis Lopez.

101.     By letter dated November 23, 2014, the Defendant changed the single point of contact to **Na Na**, with telephone number (999) 999-9999, ext. 0000000* and email N/A**. Plainly, Na Na is not a human or a single point of contact that qualifies under Regulation X. Na Na was again referenced as the single point of contact on the denial letter dated February 12, 2015.

102.     An updated single point of contact was provided on February 17, 2016 named Claudia Martinez available at 855-843-2549-ext 0366307. However, despite diligent efforts, the Plaintiffs have not actually been able to make contact with her.

103.     On February 18, 2016, Citimortgage sent a letter asking the Plaintiffs to contact Claudia to discuss their options.

104.    On February 24, 2016, Plaintiff Richard Tanasi called Citimortgage to attempt to contact Claudia. The phone prompt did not permit him to dial the extension indicated. The call was routed to a gentleman named Jose. The Plaintiff asked to be connected with Claudia.

105.    Jose told him that the records showed that the property was scheduled for foreclosure. He stated the Plaintiff was offered assistance and qualified for a short sale.

106.    The Plaintiff asked to speak to Claudia. Jose told the Plaintiff he would need to schedule an appointment and transferred the Plaintiff to the scheduling department. The Plaintiff then spoke with Schiad. The Plaintiff was told Claudia is very busy and has over 100 files. The Plaintiff scheduled a date of Friday, February 26, 2016 at 5:00 pm.

107.    On February 26, 2016, the Plaintiffs waited for a call from 5:00p.m. to 5:20p.m. at which point they attempted to call Claudia directly. The Plaintiffs spoke with Jenetta, who informed that Claudia's PC was down and scheduled a new phone call for March 3, 2016 at 6:00p.m.

108.    As of March 24, 2016, the Plaintiffs have not received a phone call from Claudia.

109.    The failure to provide a SPOC is in violation of 12 CFR 1024.40.

110.    The Plaintiffs suffered harm in the form of accrued interest, escrow charges, corporate advances, and lost equity, as well as costs and fees incurred in retaining counsel to respond to the Defendant's solicitations, and emotional trauma.

## COUNT VI:
## PATTERN AND PRACTICE

111.    The Plaintiffs repeat and re-allege the allegations contained in paragraphs 1 through 110 as if fully stated herein, further allege as follows:

112.     12 U.S.C. 2605(f) provides for damages for individuals in the amount of any actual damages, plus additional damages in cases of a pattern or practice of noncompliance up to $2,000. Moreover, in any successful action the Court must award costs together with reasonable attorneys fees.

113.     The foregoing establishes a pattern and practice of noncompliance with Regulation X.

114.     The Plaintiffs suffered harm in the form of accrued interest, escrow charges, corporate advances, and lost equity, as well as costs and fees incurred in retaining counsel to respond to the Citimortgage's solicitations, and emotional trauma.

## AS AND FOR A SECOND CAUSE OF ACTION
## VIOLATIONS OF THE CONNECTICUT UNFAIR TRADE PRACTICES ACT

### COUNT I:
### FAILURE TO APPLY LOSS MITIGATION PROGRAM UNIFORMLY

115.     The Plaintiffs repeat and re-allege the allegations contained in paragraphs 1 through 114 as if fully stated herein, further allege as follows:

116.     Plaintiffs are both "persons" as defined by Connecticut General Statutes Section 42-110a(3).

117.     The actions of the Defendants were done in the conduct of trade or commerce.

118.     The Plaintiff has engaged in unfair and/or deceptive acts or practices within the meaning of Connecticut General Statutes Section 42-110b(a) including, but not limited to:

   a.   Soliciting Plaintiffs to apply for a loan modification for which they were not eligible;

b.  Repeatedly requesting duplicative, unnecessary, or updates to documentation during the application process without reasonable justification or excuse;

c.  Making material misrepresentations or omissions likely to mislead a consumer acting reasonably under the circumstances, including misrepresenting to Plaintiffs their eligibility, continued evaluation, and expectancy of receiving a modification of their loan;

d.  Failing to apply existing loss mitigaiton policies in a uniform and fair fashion to all consumers; and

e.  Improperly charging Plaintiffs fees, interest, and other charges to which it is not entitled.

119.   The Defendants' actions have offended public policy, including the standards set forth in Regulation X and the National Mortgage Settlement.

120.   The Defendants' actions are willful, immoral, unscrupulous, unethical, and oppressive, and cause substantial injury to borrowers like the Plaintiffs.

121.   As a direct, proximate, and foreseeable result of the foregoing acts and omissions, Plaintiffs have suffered an ascertainable loss as that term is used in Connecticut General Statutes Section 42-100g(a), to wit: (1) tens of thousands of dollars in interest, attorney fees, default fees, and other costs of foreclosure charged to their account while Citimortgage processed their applications for a modification, and (2) significant sums on legal representation and other professional services and costs in an effort to obtain a modification for which the Defendants knew or should have known the Plaintiffs were ineligible.

122.   These damages frustrated the ability of Plaintiffs to pursue other loss mitigation alternatives.

123.     Defendants are liable to Plaintiffs for the damages they suffered as a result of Defendants' violations of CUTPA.

124.     A copy of this pleading has been mailed to the Attorney General and the Commission of Consumer Protection pursuant to Connecticut General Statutes Section 42-110g(c).


## COUNT II
## FAILURE TO REVIEW PLAINTIFFS UNDER EXISTING LOSS MITIGATION GUIDELINES

125.     The Plaintiffs repeat and re-allege the allegations contained in paragraphs 1 through 124 as if fully stated herein, further allege as follows:

126.     Citimortgage alleged that Hudson only performed modifications on loans it serviced itself. Such a policy conflicted with Hudson's investor guidelines and website, both of which stated that Hudson performed loan modifications without qualification as to what entity services the loan.

127.     At some point, Hudson's guidelines also changed. New procedures required that the Plaintiffs satisfy certain debt-to-income and loan-to-value ratios, including a requirement that the mortgage loan could not be more than 95% of the home's value. No actual copy of the guidelines was ever provided to the Plaintiffs.

128.     As described *supra*, Hudson intentionally failed to disclose this policy to the Plaintiffs.

129.     Upon information and belief, Hudson refuses to disclose its loss mitigation policies because it does not apply the program uniformly among consumers.

130.    On December 15, 2011, Citimortgage provided the Plaintiffs with a BPO of $899,000 for the subject property. On 9/27/2012, the payoff for the property was approximately $776,109, leading to a target fair market value of $816,956 (based on the 95% LTV ratio). Property values in Old Saybrook declined very little over the course of 2012, if at all, and upon information and belief the Plaintiffs qualified for a review under Hudson's mortgage modification program. However, without excuse or justification, Citimortgage failed to complete a review.

131.    The practice of soliciting mortgage modification applications, demanding documentation containing large amounts of sensitive personal information, and then denying the applications without review is an unfair or deceptive practice.

132.    The practice offends the public policy in favor of mortgage modifications as demonstrated by 12 CR § 1024.30-.41, the National Mortgage Settlement, and the Connecticut Foreclosure Mediation Program as codified at Connecticut General Statutes §§ 49-31k *et seq.*, the Connecticut Uniform Foreclosure Mediation Standing Orders, and the Connecticut Mortgage Foreclosure Standing Order Federal Loss Mitigation Programs.

133.    The practice described above was immoral, unethical, oppressive, or unscrupulous. It had no purpose, other than to emotionally traumatize the Plaintiffs. One letter from Citimortgage would leave the Plaintiffs to believe they may qualify for a mortgage modification, and then the next letter would destroy that belief.

134.    The emotional trauma and expense of five long years of fruitless loss mitigation has substantially injured the Plaintiffs. The practice has no benefit to consumers. The practice has no benefits for competition.

135.    The Plaintiffs have suffered quantifiable losses in the form of the lost opportunity to obtain a mortgage modification, the expense of years of litigation, as well as significant emotional trauma.

## COUNT III:
## VIOLATIONS OF REGULATION X ARE ALSO VIOLATIONS UNDER CUTPA

136.    The Plaintiffs repeat and re-allege the allegations contained in paragraphs 1 through 135 as if fully stated herein, further allege as follows:

137.    Regulation X represents a public policy of promoting fairness for consumers in the mortgage servicing industry. As observed by the Consumer Financial Protection Bureau (the "CFPB"),

> RESPA is a remedial consumer protection statute and imposes obligations upon servicers of federally related mortgage loans. RESPA has established a consumer protection paradigm of requiring disclosures to consumers, and establishing servicer requirements and prohibitions, for the purpose of protecting borrowers from certain potential harms. The disclosures include, for example, disclosures regarding escrow account balances and disbursements, transfers of mortgage servicing among mortgage servicers, and force-placed insurance notices. The requirements and prohibitions include requirements for servicers to respond to qualified written requests from borrowers and with respect to escrow account payments. Servicers are subject to civil liability for failure to comply with such requirements and prohibitions.

> Considered as a whole, RESPA, as amended by the Dodd-Frank Act, reflects at least two significant consumer protection purposes: (1) to establish requirements that ensure that servicers have a reasonable basis for undertaking actions that may harm borrowers and (2) to establish servicers' duties to borrowers with respect to the servicing of federally related mortgage loans.

Preamble to Regulation X, 48-49, *available at* http://files.consumerfinance.gov/f/201301_ cfpb_final-rule_servicing-respa-preamble.pdf (last accessed March 17, 2016 at 2:34 p.m.).

138.    Based on the foregoing, violations of RESPA and Regulation X offend public policy so as to amount to an established concept of unfairness. Regulation X was specifically written in order to make mortgage servicing fairer to consumers.

139.    The Plaintiffs suffered harm in the form of accrued interest, escrow charges, corporate advances, and lost equity, as well as costs and fees incurred in retaining counsel to respond to Citimortgage's solicitations, and emotional trauma.

## AS AND FOR A THIRD CAUSE OF ACTION
## CONNECTICT CREDITOR'S COLLECTION PRACTICES ACT

140.    The Plaintiffs repeat and re-allege the allegations contained in paragraphs 1 through 139 as if fully stated herein, further allege as follows:

141.    A person harmed by a "creditor [who uses] any abusive, harassing, fraudulent, deceptive or misleading representation, device or practice to collect or attempt to collect any debt" has a private right of action against the creditor for damages. Conn. Gen. Stat. §§ 36a646, 36a648.

142.    A creditor includes "any person to whom a debt is owed by a consumer debtor and such debt results from a transaction occurring in the ordinary course of such person's business . . . ." Conn. Gen. Stat. § 36a645(2).

143.    The Defendants are creditors.

144.    The foregoing acts of the Defendants violate the Connecticut Creditor's Collections Practices Act in that they were deceptive or misleading representations used in connection with the collection of a debt.

145.   The Plaintiffs suffered harm in the form of accrued interest, escrow charges, corporate advances, and lost equity, as well as costs and fees incurred in retaining counsel to respond to the Defendants' solicitations, and emotional trauma.

## AS AND FOR A FOURTH CAUSE OF ACTION
## NEGLIGENT MISREPRESENTATION

## COUNT I
## FAILURE TO DISCLOSE RESTRICTIONS

146.   The Plaintiffs repeat and re-allege the allegations contained in paragraphs 1 through 145 as if fully stated herein, further allege as follows:

147.   At all relevant times Citimortgage acted as Hudson's agent with respect to servicing their account, "loss mitigation" options available to them, and all matters related to the foreclosure proceeding that was commenced. Hudson is liable to the Plaintiffs for all damages suffered as a result of the acts or omissions of its agent, Citimortgage.

148.   Throughout the relevant period, Citimortgage repeatedly made representations to Plaintiffs regarding its willingness to evaluate them for another loan modification as a means of curing their default on their note and mortgage, intended for Plaintiffs to believe they were eligible for a loan modification, and solicited them to apply for such a loan modification.

149.   Had Citimortgage informed Plaintiffs of the investor restrictions when they inquired about available options, they would have sought other means of curing their default such as, for example, liquidation of their property to recover the value of their equity, a loan through Connecticut's Emergency Mortgage Assistance Program to reinstate their mortgage loan, refinancing through third parties, or a Chapter 13 bankruptcy.

150.    Citimortgage did not disclosure investor restriction until May 10, 2012, when it informed Plaintiffs that any variation of the terms of the mortgage was impermissible according to the rules of the investor.

151.    Plaintiffs were injured by their pursuit of an unavailable modification. Citimortgage charged their account with tens of thousands of dollars in interest, its attorney fees, default fees, and other costs of foreclosure while it claimed to be reviewing them for a modification, and they expended significant sums on legal representation and other professional services and costs in an effort to obtain a modification for which Citimortgage knew or should have known they were ineligible.

152.    Upon information and belief, Citimortgage and / or Hudson are seeking to collect, for its own benefit, all interest accrued and certain property perseveration fees since the default date. Upon information and belief, upon a judgment of foreclosure rendered in the underlying action Citimortgage and /or Hudson were awarded all fees, interest, attorney fees, and other default-related charges it incurred while reviewing Plaintiffs for a modification for which they could not qualify.

153.    Citimortgage and / or Hudson's conduct and various failures during this supposed evaluation increased the amount sought by them in connection with their foreclosure action, and, in turn, the damages suffered by Plaintiffs' as a result of Citimortgage and / or Hudson's failure to disclosure the existence and applicability of investor restrictions.

154.    Citimortgage negligently made a representation of fact that it knew or should have known as false.

155.    Rather than pursue other loss mitigation options, Plaintiffs relied on Citimortgage's representations and elected to pursue a loan modification.

## COUNT II
## FAILURE TO COMPLETE LOSS MITIGATION REVIEW

156.    The Plaintiffs repeat and re-allege the allegations contained in paragraphs 1 through 155 as if fully stated herein, further allege as follows:

157.    Through a combination of duplicative, exhaustive, and ever-changing requests, Citimortgage took years to evaluate Plaintiffs for a loan modification. Throughout this process, Citimortgage regularly ignored agreed-upon deadlines for review, repeatedly agreed that Plaintiffs application was complete before reversing course and requesting more documents, and failed to comply with servicing standards established by the National Mortgage Settlement.

158.    Citimortgage represented that it would review the Plaintiffs under a stated loss mitigation policy.

159.    Citimortgage knew it was not actually going to review the Plaintiffs under a stated loss mitigation policy or offer them any meaningful home retention options.

160.    The Plaintiffs relied on the representations that a review would be conducted.

161.    The Plaintiffs suffered harm in the form of accrued interest, escrow charges, corporate advances, and lost equity, as well as costs and fees incurred in retaining counsel to respond to the Citimortgage's solicitations, and emotional trauma.


## AS AND FOR A FIFTH CAUSE OF ACTION
## INNOCENT MISREPRESENTATION

162.    The Plaintiffs repeat and re-allege the allegations contained in paragraphs 1 through 161 as if fully stated herein, further allege as follows:

163.    Citimortgage represented that it would review the Plaintiffs under a stated loss mitigation policy.

164.    The representation was made solely for the purpose of causing the Plaintiffs to submit loss mitigation applications.

165.    The representation was never true.

166.    Plaintiffs justifiably relied on the Citimortgage's representations.

167.    The Plaintiffs suffered harm in the form of accrued interest, escrow charges, corporate advances, and lost equity, as well as costs and fees incurred in retaining counsel to respond to the Citimortgage's solicitations, and emotional trauma.

## AS AND FOR A SIXTH CAUSE OF ACTION
## NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

168.    The Plaintiffs repeat and re-allege the allegations contained in paragraphs 1 through 166 as if fully stated herein, further allege as follows:

169.    Citimortgage's wanton conduct towards the Plaintiffs created an unreasonable risk of emotional distress.

170.    The Plaintiffs' emotional distress was foreseeable.

171.    In foreclosure cases, individual defendants are exposed to extraordinary stressors that may cause emotional trauma. These strong, significant psychological effects are foreseeable. The National Institute of Mental Health defines a range of depressive disorders. Major depression "is disabling and prevents a person from functioning normally."[16]A milder form, called "dysthymic disorder""can prevent normal functioning..."*Id.*

172.    A study found that persons that were at least two months behind on mortgage payments had significant health issues, including increased change of hypertension and heart

---

[16] Definitions taken from the National Institute of Mental Health's website.

disease. Pollack, C.E. et al., *Health status of people undergoing foreclosure in the Philadelphia region*, 99 AM.J.PUB.HEALTH1833-39 (2009). More than one third of those sampled also met the criteria for major depression. *Id.*

173.   The emotional distress has actually occurred and has manifested itself in the form of illness and bodily harm.

174.   Citimortgage's conduct was the cause of the Plaintiffs' distress.

175.   Damages are in an amount to be determined at trial but are believed to exceed $75,000.

## AS AND FOR A SEVENTH CAUSE OF ACTION
## VICARIOUS LIABILITY OF HUDSON

176.   The Plaintiffs repeat and re-allege the allegations contained in paragraphs 1 through 175 as if fully stated herein, further allege as follows:

177.   At all times material, Hudson employed or retained Citimortgage to act as its mortgage servicing agent. Citimortgage was under Hudson's direct supervision, employ, and control when it committed the wrongful and negligent acts described herein. Citimortgage engaged in this conduct while acting in the course and scope of its mortgage servicing duties on behalf of Hudson and / or accomplished the wrongful and negligent acts by virtue of its apparent authority.

178.   Hudson granted Citimortgage authority to perform as agent for Hudson. Hudson held Citimortgage out to the community as the mortgage servicing agent of Hudson delegated to perform all necessary acts related to the subject mortgage loan. Citimortgage committed the wrongful and negligent acts described herein within the apparent and / or actual authority arising

from its agency relationship with Hudson. Said conduct was undertaken in the course and scope of Citimortgage's duties as mortgage servicer for Hudson and / or was ratified by Hudson.

179.    Citimortgage was acting at least in part to serve the best interests of Hudson when it committed the wrongful and negligent acts complained of. Specifically, Citimortgage was acting as agent, as well as using the trust, power and authority of the position granted, while it engaged in default servicing operations with regards to the Plaintiffs' mortgage loan.

180.    By using its position, Citimortgage purported to act and / or speak on behalf of Hudson when it committed the wrongful, tortious, and negligent acts complained of herein. Plaintiffs relied on Citimortgage's apparent and / or actual authority to act on behalf of Hudson.

181.    Negligent default servicing was a foreseeable and well-known issue in the mortgage servicing industry at the time the Defendants entered into their agency relationship.

182.    The tortious conduct complained of occurred during the course and scope of Citimortgage's agency relationship with Hudson. Hudson is liable for the negligent and wrongful conduct of Citimortgage under the law of vicarious liability, including the doctrine of respondent superior.

183.    As a direct result of Citimortgage's conduct, Plaintiffs suffered the injuries and damages described herein.

184.    As the principal of Citimortgage, Hudson is vicariously liable for all of the conduct complained of in Paragraphs 1 through 183 of the foregoing complaint.

185.    Damages are in an amount to be determined at trial but are believed to exceed $75,000.

**WHEREFORE**, Plaintiffs pray for a judgment:

i.  ordering Defendants to remove all wrongful charges, fees, and interest from their account;

ii.  ordering Defendants to reimburse them for all the attorney and professional fees, and all other reasonable costs they have incurred during the course of this action;

iii.  order Defendants to pay Plaintiffs actual damages, statutory damages, and attorneys fees pursuant to 12 U.S.C. §2605(f);

iv.  order Defendants to pay Plaintiffs actual damages, statutory damages, and attorneys fees pursuant to Connecticut General Statutes Section 36a-645 *et seq.*;

v.  ordering Defendants to pay Plaintiffs actual and consequential damages pursuant to Connecticut General Statutes Section 42-110g(a);

vi.  ordering the Defendants to pay Plaintiffs punitive damages against the Defendants in an amount calculated to punish the Defendants for its willful and egregious conduct pursuant to Connecticut General Statutes Section 42-110g(a);

vii.  enjoin all unlawful acts and practices complained of herein pursuant to Connecticut General Statutes Section 42-110g(d); and

viii.  award Plaintiffs reasonable attorneys' fees and costs, pursuant to Connecticut General Statutes Section 42-100g(d); together with

such other and further relief as this Court deems just and proper.

THE PLAINTIFFS
RICHARD AND ATHANSULA TANASI

Dated: May 16, 2016

_/s/ David Lavery_
David Lavery (ct29971)
Beckett Law, LLC
543 Prospect Avenue
Hartford, CT  06105
T: (860) 236-1111
F: (860) 236-0050
davidl@beckett-law.com