# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| RICHARD TANASI and ATHANSULA TANASI, | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | No. 3:16-CV-00727 (VAB) |
| | : | |
| CITIMORTGAGE, INC et. al, | : | |
| Defendants. | : | |
| | : | |

## RULING ON DEFENDANTS' MOTION TO DISMISS THE FIRST AMENDED COMPLAINT

**Table of Contents**

I.      Introduction                                                                            1
II.     Factual Allegations                                                              2
        A.  State Foreclosure Proceedings                                  3
        B.  Mortgage Modification Requests                               5
        C.  Other Correspondence between the Tanasis and CitiMortgage   6
        D.  Single Point of Contact                                           8
        E.  Defendant M&T Bank                                                9
        F.  The Current Proceedings                                          9
III.    Standard of Review                                                          11
IV.     Discussion                                                                        12
        A.  Motion to Dismiss for Lack of Jurisdiction under Rule 12(b)(1)   13
          1.  The *Rooker-Feldman* Doctrine                                13
          2.  The Tanasis' Claims                                              14
              a.   The Tanasis do not Invite Review and Rejection of the   16
                   Foreclosure Action
              b.   The Tanasis do not Complain of an Injury Caused by a   18
                   State Court Judgment
          3.  Res Judicata                                                       21
              a.   The Transaction Test and Foreclosure Actions          23
              b.   The Tanasis' Claims                                          27
        B.  Motion to Dismiss under Rule 12(b)(6)                          30
          1.  The Tanasis' RESPA Claims                                      31
              a.   CitiMortgage's Liability under 12 U.S.C. § 2605(e)     32
              b.   CitiMortgage's Liability under Regulation X            37
                  i.   Liability under 12 C.F.R. § 1024.36 for Failure to   37
                       Respond to RFIs
                  ii.  Liability under 12 C.F.R. § 1024.35 for Failure to   40
                       Respond to NOEs
              c.   Damages under RESPA                                        42
                  i.   Emotional Distress Damages                          43
                  ii.  Postage Costs                                           45
                  iii. Miscellaneous Damages                               46
                  iv.  Statutory Damages                                      47
          2.  The Tanasis' Negligence Claims                               48
              a.   CitiMortgage's Duty of Care, Generally                 48
              b.   Negligent Infliction of Emotional Distress            49
          3.  The Tanasis' CUTPA Claims                                      52
              a.   Unfair Business Practice                                   52
              b.   The Tanasis' Ascertainable Loss under CUTPA           53
          4.  Statute of Limitations for Negligence and CUTPA claims   55
          5.  Defendant M&T Bank                                              57
V.      Conclusion                                                                      60

## I.   Introduction

Richard and Athansula Tanasi ("the Tanasis") bring this action against CitiMortgage, Inc. ("CitiMortgage"), which serviced a mortgage on their home, and M&T Bank Corporation ("M&T"), the successor by merger to Hudson City Savings Bank ("Hudson"), which owned the mortgage.  The Tanasis allege that both Defendants violated the Real Estate Settlement Procedures Act of 1974 ("RESPA"), 12 U.S.C. 2601 *et seq*., and its implementing regulations, specifically Regulation X Mortgage Servicing Final Rule, 78 F.R. 10695 (February 14, 2013), 12 CFR § 1024 ("Regulation X").  They also allege that Defendants breached a duty of care owed to them under those regulations and a related consent decree.  Finally, they allege that Defendants violated the Connecticut Unfair Trade Practices Act ("CUTPA").

Defendants move to dismiss all three causes of action.  Defendants first argue that this Court lacks jurisdiction over the Tanasis' claims because of the *Rooker-Feldman* doctrine and *res judicata*. Defendants further argue that the Tanasis fail to state claims upon which relief can be granted.

The Court concludes that jurisdiction is permissible under *Rooker-Feldman*, but agrees with Defendants that most of the Tanasis' claims are barred by *res judicata* and cannot be asserted here. For the remaining claims, it reviews Defendants' motion to dismiss under Rule 12(b)(6), and concludes that the Tanasis' remaining RESPA, CUTPA, and negligence claims cannot be dismissed. Accordingly, Defendants' motion to dismiss is GRANTED in part and DENIED in part.

Specifically, regarding Claim One, the Court must dismiss under *res judicata* the claims that Defendants violated RESPA and Regulation X by failing to acknowledge or properly review loss mitigation applications (Compl., ¶¶ 71-81).  This includes claims that arise under Regulation X's 12 C.F.R. § 1024.41.  It also must dismiss under Rule 12(b)(6) the Tanasis' claims under Section 2605(e) of RESPA relating to qualified written requests that did not pertain to "servicing" and therefore were not actionable under the statute. While Count One is not dismissed, because the Tanasis' claims under Regulation X's 12 C.F.R. § 1024.36 and 1024.35 remain, the Court notes the

1

limitations on their damages relating to these claims.  The Court dismisses any of the Tanasis' claims for RESPA damages relating to "costs related to stripping the Property of equity," "unnecessary costs of maintaining the Property due to delayed foreclosure," and the creation of a "public record of foreclosure."  *See* Compl. ¶¶ 61-65.  It also dismisses the Tanasis claims for compensatory damages for costs relating to the preparation of requests for information, because these costs would have been incurred regardless of CitiMortgage's alleged violations.

In Claim Two, the Court dismisses under *res judicata* the Tanasis' claims concerning Defendants' negligent processing of their loss mitigation and mortgage modification applications. Because some of the negligence claim arises out of other acts, the Court does not dismiss Claim Two in its entirety.

There are many components to Claim Three, in which the Tanasis allege violations of CUTPA.  Of these, the claim that CitiMortgage violated CUTPA by unfairly applying its existing loss mitigation policies, *see* Compl. at ¶ 149(d), is dismissed under *res judicata*.

## II.    Factual Allegations

In 2007, Richard Tanasi and Athansula Tanasi ("the Tanasis") bought a piece of property at 27 Briarwood Drive in Old Saybrook, Connecticut (the "Property").  First Amended Complaint ("Compl."), ECF No. 18, ¶ 4.  The Property was encumbered by a first-position mortgage loan in the principal amount of $656,250, dated August 2, 2007, which was given as security for a promissory note of the same date and recorded on August 6, 2007.  *Id.* at ¶ 12.  The original underwriter sold or otherwise transferred the mortgage to Wachovia Savings Bank and CitiMortgage purchased the mortgage shortly afterwards.  *Id.* CitiMortgage then sold the mortgage to Hudson on or about November 27, 2007, but continued to service the mortgage.  *Id*. at ¶ 12.  Hudson later merged with Defendant M&T Bank.  *Id.* at ¶¶ 5. Both CitiMortgage and M&T Bank are corporations organized under the laws of New York.  *Id.* at ¶¶ 2-3.

In 2010, the Tanasis fell behind on their mortgage payments.  CitiMortgage initiated a

foreclosure action in 2011 and foreclosed on the Property on March 7, 2016.  *See* CitiMortgage's

Mot., Exhibit C, ECF No. 26-4, Docket ("Foreclosure Docket").  Before and during the foreclosure

process, the Tanasis communicated with CitiMortgage about their mortgage.  These

communications—as well as the reach of consumer-protection statutes, the relative duties of state

and federal courts, and the tension between the finality of judgments and the promise of full relief—

are at the heart of this case.

### A.  State Foreclosure Proceedings

The Tanasis missed their first mortgage payment on or about July 1, 2010, and did not make

any payments after that date.  CitiMortgage's Mot., Exhibit D, ECF No. 26-5, CitiMortgage's Motion

to Terminate Mediation Stay, MMX-cv-11-6005630-S (Middlesex Superior Court), 2.[1]  They allege,

however, that CitiMortgage solicited them for loss mitigation on their mortgage as early as June

2009.  Compl. ¶ 14.   The Tanasis applied for a mortgage modification in response to one of these

solicitations, a letter they received from CitiMortgage on June 17, 2009.  *Id.*  CitiMortgage denied

their application on November 27, 2009.  *Id.* at ¶ 15.  On December 1, 2009, CitiMortgage followed

up with another letter, which stated that the Tanasis' income exceeded the allowable amount under

the Home Affordable Modification Program ("HAMP") and that the Tanasis had insufficient credit

for modification.  *Id.* The Tanasis applied for loss mitigation two more times before CitiMortgage

---

[1] The Court considers the state court documents that CitiMortgage attaches to its complaint in its evaluation of CitiMortgage's motion.  Generally, when a defendant attempts to counter a plaintiff's Complaint with its own factual allegations and exhibits, such allegations and exhibits are inappropriate for consideration by the Court at the motion to dismiss stage. *See, e.g., Dual Groupe, LLC v. Gans-Mex LLC*, 932 F. Supp. 2d 569, 572 (S.D.N.Y. 2013). Nevertheless, in its analysis, the Court may refer "to documents attached to the complaint as an exhibit or incorporated in it by reference, to matters of which judicial notice may be taken, or to documents either in [the] plaintiff['s] possession or of which [the] plaintiff [ ] had knowledge and relied on in bringing suit." *Brass v. Am. Film Tech., Inc.*, 987 F.2d 142, 150 (2d Cir. 1993).  This Court may also consider public documents, "particularly where plaintiff has been put on notice by defendant's proffer of these public documents."  *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47 (2d Cir. 1991).  In this case, the Plaintiffs were on notice of the state court filings that CitiMortgage includes as exhibits to its Motion to Dismiss, and Court's consideration of these documents does not risk converting CitiMortgage's motion to dismiss into a summary judgment motion.  *Id.*

commenced a foreclosure action, allegedly at "CitiMortgage's request." *Id.* CitiMortgage denied these applications on October 6, 2010 and November 14, 2010. *Id.*

CitiMortgage filed a foreclosure action in Connecticut Superior Court (the "Foreclosure Action") on July 18, 2011. *See* Compl. ¶ 18; Foreclosure Docket, p. 1. Shortly thereafter, the Tanasis filed a request to participate in the court's foreclosure mediation program, which was granted on August 28, 2011. *See* Foreclosure Docket, 102.00. The parties met in "numerous mediation sessions" between October 26, 2011 and December 4, 2012. CitiMortgage's Motion to Terminate Mediation Stay, 4.

On December 27, 2012, CitiMortgage moved to terminate the mediation efforts. *Id.* The Tanasis did not object to this motion and the Superior Court granted it on January 4, 2013. *Id.* On November 11, 2013, the Tanasis filed an answer and special defense to the Foreclosure Action, admitting that they had signed the Note and Mortgage, but denying the "authenticity of, and authority to make, each signature on the Note." CitiMortgage's Mot., Ex. E, ECF No. 26-6, Mem. of Decision on Mot. for Summ. J., MMX-cv-11-6005630-S (Middlesex Superior Court).

On July 10, 2014, CitiMortgage moved for summary judgment in the foreclosure case. *See* Foreclosure Docket, 138.00. The Superior Court granted this motion on October 10, 2014. *See* CitiMortgage's Mot., Ex. E, Mem. of Decision on Mot. for Summ. J. On July 23, 2015, the Tanasis moved to dismiss the foreclosure action, contesting CitiMortgage's standing to commence the foreclosure action and arguing that it "fraudulently invoked the rebuttable presumption of ownership." Foreclosure Docket, 149.00. This motion was denied. *Id.* at 149.10. On March 7, 2016, the Superior Court granted CitiMortgage a judgment of strict foreclosure and found that the outstanding debt under the Note and Mortgage was $960,871.75. *See* CitiMortgage's Mot., Ex. H, ECF No. 26-9, Notice of Judgment of Strict Foreclosure. In March of 2016, before the extinguishment of their right of redemption, the Tanasis filed an appeal with the Connecticut Appellate Court. Foreclosure Docket, 171.00. On May 11, 2016, the Tanasis filed a motion for

4

articulation of the Superior Court's decision on their motion to dismiss.  *Id.* at 172.00.  After their motion was granted, the Superior Court published an articulation of its factual and legal basis for denying the Tanasis' motion to dismiss the Foreclosure Action.  *Id.* at 175.00.

### B.  Mortgage Modification Requests

The Tanasis allege that they have been "engaged in loss mitigation efforts with CitiMortgage continuously since 2009," Compl. ¶ 14, and many of their claims concern CitiMortgage's improper solicitation and dispensation of thier loss mitigation and mortgage modification applications.  The Tanasis also allege that CitiMortgage moved for summary judgment on the Foreclosure Action when several of their mortgage modification and loss mitigation applications were pending.  *Id.* at ¶ 26.

On February 10, 2012, Beckett Law, LLC submitted a mortgage modification application on behalf of the Tanasis.  Compl. ¶ 18.  CitiMortgage acknowledged the request on March 7, 2012, when it requested additional documents, which the Tanasis later submitted.  *Id.*  On May 10, 2012, CitiMortgage denied the mortgage modification application.  *Id.*  Less than one month later, the Tanasis allege, CitiMortgage solicited them to submit a new mortgage modification application.  *Id.* at ¶ 19.  The Tanasis completed this application on November 2, 2012.  *Id.*  CitiMortgage allegedly did not respond to the Tanasis' November 2, 2012 modification application.

Instead of responding to their pending applications, CitiMortgage solicited the Tanasis to modify their mortgage again.  CitiMortgage allegedly sent letters to the Tanasis on January 7, 2014 and December 17, 2015, asking them to submit new mortgage modification applications. Compl. at ¶¶ 18-20. On January 28, 2016, as well as on several dates in February and March of that year, CitiMortgage allegedly communicated by mail and e-mail with the Tanasis, requesting loss mitigation applications and stating that "[w]hether you want to remain in your home or want to consider other alternatives, we are here to work with you to find the best option for your current situation."  *Id.* at ¶ 39.

While it continued to solicit mortgage modification applications from the Tanasis, CitiMortgage allegedly failed to respond to the many applications that the Tanasis did submit. The Tanasis allege that CitiMortgage generally had a policy of "automatically closing mortgage modification applications internally after they were open for sixty days." Compl. ¶ 24. The Tanasis allegedly applied to modify their mortgage three times after Regulation X became effective on January 10, 2014: On February 21, 2014, July 3, 2014, and August 17, 2015. *Id.* at ¶¶ 20, 23, 26. CitiMortgage never responded to these applications. *Id*.

The Tanasis also allege that CitiMortgage "had a policy of automatically requesting duplicative information for loss mitigation applications every 30 days in order to avoid exercising reasonable diligence in completing an application." Compl. at ¶ 25. CitiMortgage allegedly responded to loss mitigation applications with requests for bank statements, pension and pay stubs, property tax forms, and affidavits of hardship. *See id* at ¶¶ 23, 27-28. The Tanasis allege that CitiMortgage requested additional documents on eleven occasions in 2014 and twice in 2015. *Id*.

### C.  Other Correspondence between the Tanasis and CitiMortgage

The Tanasis also allege that CitiMortgage failed to respond to many of their requests for information, some of which, they allege, were qualified written requests, requests for information, or notices of error under RESPA. They allege that this "persistent and ongoing failure to provide adequate responses … deprived [them] of information to which they are legally entitled about their mortgage and … prevented them from making accurate and informed choices about the best avenue to save their home." Compl. ¶ 87.

The Tanasis allege that they mailed two qualified written requests to CitiMortgage, seeking "information about the payoff of their loan and the holder of their note," on January 13, 2014 (¶ 21) and March 5, 2015 (¶ 34). CitiMortgage responded to both requests in a letter dated April 2, 2015, "arguing that it was not required to provide a response because the Plaintiffs were in an active bankruptcy case." *Id.* at 35. The Tanasis had filed for bankruptcy on February 10, 2011, but the case

was closed on July 6, 2011.  *Id.* at n.2.  They therefore allege that CitiMortgage was required under RESPA to respond to their requests.

The Tanasis also allege that they requested information from CitiMortgage on or about October 27, 2014 (¶ 83), March 16, 2016 (¶ 40), March 30, 2016 (¶ 41), and May 11, 2016 (¶ 42). The March 16, 2016 request sought information about "(1) alleged investor restrictions, (2) evidence that CitiMortgage submitted waiver requests, and (3) evidence of CitiMortgage's efforts to obtain a waiver of investor restrictions."  *Id.* at ¶ 40.  CitiMortgage allegedly responded to the March 16, 2016 request with a statement that the information was "privileged."  *Id.*

In the March 30, 2016 request, the Tanasis sought information about "(1) the owner/assignee of the loan, (2) the servicer's participation in HAMP and the national mortgage settlement, and (3) the parameters of loan modification programs."  *Id.* at ¶ 41.  CitiMortgage allegedly responded to the March 30, 2016 request on April 14, 2016, with information about the owner/assignee of the loan but not about loan modification programs. *Id.*

In the May 11, 2016 request, the Tanasis sought information about "broker prices opinions and appraisals … to see if CitiMortgage was engaging in any meaningful loss mitigation review."  *Id.* at ¶ 42.  The Complaint does not allege whether CitiMortgage responded to the May 11 request.  The Tanasis contend that CitiMortgage failed to respond to another request, dated October 27, 2014, but the Complaint does not include any allegations about the content of that request.  *Id.* at ¶ 83.

The Tanasis also allege that CitiMortgage received two notices of error on their behalf, on July 6, 2015 (¶ 45) and May 13, 2016 (¶ 43).  In the first, the "errors asserted included 1) not answering as to if the Investor participates in the HAMP program …, 2) not responding as to if the investor participates in the FHA-HAMP program or in the National Mortgage Settlement Modification; 3) not replying as to what proprietary modification programs are available, and 4) not providing the surplus or deficit of income requirements for proprietary modifications."  *Id*. at ¶ 45. CitiMortgage, they allege, did not respond.  *Id.*

7

The second alleged notice of error stated that CitiMortgage "failed to 1) provide evidence of its efforts at waiving investor restrictions, 2) provide any information about its servicer participation agreement for HAMP or its compliance with the National Mortgage Settlement, 3) acknowledge the three previous requests for information, and 4) provide information about the loss mitigation options the Plaintiffs were eligible for."  Compl. ¶ 43.  CitiMortgage allegedly responded to this notice in a letter dated June 6, 2016, in which it "1) claimed that it was not required to give Plaintiffs BPOs or appraisals, 2) it argued that it had exercised all efforts to qualify the Plaintiffs for all Home Owners Assistance Programs … 3) did not provide any information about its compliance with [HAMP or the National Mortgage Settlement], 4) stated it was providing copies of the acknowledgements for the prior requests but did not actually attach them, and 5) declined to provide any information about the availability of loss mitigation programs, other than to state that it was reviewing the Plaintiffs for a modification."  *Id.* at ¶ 44.

### D.  Single Point of Contact

The Tanasis allege that, in a letter that they received on November 11, 2014, CitiMortgage identified a single point of contact with whom the Tanasis could communicate about their mortgage. Compl. ¶ 120.  On November 23, 2014, CitiMortgage allegedly sent a letter changing the point of contact to "Na Na, with telephone number (999) 999-9999, ext. 0000000* and email N/A."  *Id.* at ¶ 121.  On February 17, 2016, CitiMortgage allegedly identified a new single point of contact, Claudia Martinez, and provided her phone number, but not an extension for her direct line.  *Id.* at ¶ 122. When Mr. Tanasi called Ms. Martinez's phone number, he was able to reach an employee named "Jose" and another named "Schiad," who told him that the Tanasis would need to schedule a "call back appointment" with Ms. Martinez.  *Id.* at ¶ 124.  Ms. Martinez did not return the Tanasis' call at the scheduled callback time.  *Id.* at ¶ 125  When the Tanasis called her office, they were allegedly informed that she would not be able to speak with them because her PC "was down."  *Id.*  The Tanasis made another appointment for a "call back" with Ms. Martinez, but she did not call them at

that time.  *Id.* at ¶ 126.  CitiMortgage then assigned a new single point of contact to the Tanasis on

March 29, 2016.  *Id.*  The new single point of contact allegedly told the Tanasis that they "would not

have any access to a [single point of contact] because of the pending appeal of the foreclosure

judgment."  *Id.*

### E.  Defendant M&T Bank

The Tanasis allege that CitiMortgage was the mortgage servicing agent for Hudson City

Savings Bank, M&T's predecessor, and that CitiMortgage was under Hudson's "direct supervision,

employ, and control when it committed the wrongful and negligent acts described in the Complaint."

Compl. at ¶¶ 5, 46.  The Tanasis also allege that "CitiMortgage's servicing of the Mortgage is

governed by a Master Mortgage Loan Purchasing and Servicing Agreement between CitiMortgage

and Hudson," under which CitiMortgage had the authority to "waive, modify or vary any term of any

Mortgage Loan or consent to the postponement of compliance with any [term]," but could not

"permit any modification that could change the Mortgage Interest Rate, defer or forgive they

payment of any principal or interest, change the outstanding principal amount, [or] extend the

maturity date."  *Id.* at ¶ 58.  CitiMortgage was also allegedly permitted to "take such action as it shall

deem to be in the best interest of [Hudson]."  *Id.* at ¶ 59. The Tanasis also allege that Hudson "held

itself out to the public as offering mortgage modifications," *id.* at ¶ 54, and indicated that it had a

"Loan Modification Policy" in 10-K filings with the Securities and Exchange Commission.  *Id.* at ¶¶

56-57.

### F.  The Current Proceedings

On May 16, 2016, the Tanasis filed a Complaint against both Defendants, alleging violations

of RESPA, CUTPA, and common law negligence.  Both Defendants moved to dismiss on July 29,

2016.  On August 19, 2016, the Tanasis filed their First Amended Complaint, alleging the same three

causes of action.  Both Defendants moved to dismiss on September 16, 2016.  *See* CitiMortgage's

Mot., ECF No. 26-1; M&T's Mot., ECF No. 25-1.  After oral argument on this motion in November,

the parties submitted supplemental briefs to the Court concerning the availability of damages for emotional distress under CUTPA.  *See* ECF Nos. 34-35.

In their First Amended Complaint, the Tanasis assert three causes of action, all of which Defendants seek to dismiss.  The Tanasis first claim that CitiMortgage violated RESPA and Regulation X by failing to provide acknowledgement notices in response to loss mitigation applications and for improperly responding to the applications when it did reply, and by failing to respond to the Tanasis' various requests for information and notices of error.  *See* Compl. ¶¶ 66-95. The Tanasis also allege that CitiMortgage "engaged in a pattern and practice of noncompliance with RESPA and Regulation X."  *Id.* at ¶ 96.

In the second cause of action, the Tanasis claim that CitiMortgage negligently and consistently failed to provide accurate information about the loss mitigation options available to the Tanasis, failed to provide an accessible single point of contract, and misrepresented loan modification options to the Tanasis "through a combination of duplicative, exhaustive, and ever-changing requests."  Compl. ¶¶ 98-136.  These actions, the Tanasis allege, violated a duty that CitiMortgage owed to them under Regulation X as well as the National Mortgage Settlement, a consent decree between CitiMortgage, the federal government, and 49 states' attorneys general.  *Id.* at ¶ 99.   In the National Mortgage Settlement, CitiMortgage allegedly agreed to engage in loss mitigation programs and disclose accurate information to borrowers.  *Id.* at ¶¶ 100-108.  The Tanasis' Complaint also lays out the elements of a negligent infliction of emotional distress claim.  *Id.* at ¶¶ 137-38.  In their motions to dismiss, Defendants seek to dismiss this claim as well.  *See* CitiMortgage's Mot., 25.

In their third cause of action, the Tanasis allege that Defendants violated the Connecticut Unfair Trade Practices Act ("CUTPA") by "a) soliciting the Tanasis to apply for a loan modification for which they were not eligible; b) repeatedly requesting duplicative, unnecessary, or updates to documentation during the application process without reasonable justification or excuse; c) making

material misrepresentations or omissions likely to mislead a consumer acting reasonably under the circumstances, including misrepresenting to the Tanasis their eligibility, continued evaluation, and expectancy of receiving a modification of their loan; d) failing to apply existing loss mitigation policies in a uniform and fair fashion to all consumers; and e) improperly charging the Tanasis fees, interest, and other charges to which CitiMortgage is not entitled."  Compl., ¶ 149.

The Tanasis contend that Hudson, the predecessor of M&T, retained CitiMortgage to act as its mortgage servicing agent, directly supervised CitiMortgage's negligent servicing of the mortgage, Compl. ¶¶ 46-51, and is "vicariously liable" for CitiMortgage's violations.  *Id.* at ¶ 145.

As a result of the alleged violations, the Tanasis claim to have suffered losses relating to the "stripping [of] the Property of equity" (Compl. ¶ 61), the unnecessary maintenance of the Property due to delayed foreclosure (*id.* at ¶ 62), the expenditure of "postage, copying and fees" when submitting loss mitigation applications and requests for information (*id.* at ¶ 63), the creation of a public record of foreclosure (*id.* at ¶ 64), and "emotional trauma" (*id.* at ¶ 65). The Tanasis also claim that CitiMortgage is liable for statutory damages under RESPA of up to $2,000 for its pattern or practice of RESPA violations (*id.* at ¶ 97).

## III.    Standard of Review

Defendants move to dismiss under Federal Rule 12(b)(1), arguing that this Court lacks subject matter jurisdiction, and under Rule 12(b)(6), arguing that the Tanasis fail to state a claim. Dismissal under 12(b)(1) is appropriate when the Court lacks the statutory or constitutional power to adjudicate the claim.  Fed. R. Civ. P. 12(b)(1); *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000).  On a Rule 12(b)(1) motion to dismiss, the party asserting subject matter jurisdiction bears the burden of proving subject matter jurisdiction by a preponderance of the evidence and the "Court may consider evidence outside the pleadings."  *P v. Greenwich Bd. of Educ.*, 929 F. Supp. 2d 40, 45-46 (D. Conn. 2013) (citing *Makarova*, 201 F.3d at 113) (internal citations ommitted). Otherwise, the standards for dismissal under Fed. R. Civ. P. 12(b)(1) and 12(b)(6) are "identical."  *Id.*; *see also*

*Tandon v. Captain's Cove Marina of Bridgeport, Inc.,* 752 F.3d 239, 243 (2d Cir. 2014) ("In resolving a motion to dismiss under Rule 12(b)(1), the district court must take all uncontroverted facts in the complaint (or petition) as true, and draw all reasonable inferences in favor of the party asserting jurisdiction. ... But '[w]here jurisdictional facts are placed in dispute, the court has the power and obligation to decide issues of fact by reference to evidence outside the pleadings, such as affidavits.'") (citing *APWU v. Potter,* 343 F.3d 619, 627 (2d Cir. 2003)).

To survive a motion to dismiss under Rule 12(b)(6), a plaintiff must state a claim for relief that is plausible on its face.  Fed. R. Civ. P. 12(b)(6); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  A claim is facially plausible if "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*  Although "detailed factual allegations" are not required, a complaint must offer more than "labels and conclusions," or "a formulaic recitation of the elements of a cause of action" or "naked assertion[s]" devoid of "further factual enhancement."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 557 (2007). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."  *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 556).   In determining whether Plaintiffs have met this standard, the Court must accept the allegations in the complaint as true and draw all reasonable inferences in the light most favorable to the non-moving party.  *In re NYSE Specialists Sec. Litig.*, 503 F.3d 89, 95 (2d Cir. 2007).

## IV.   Discussion

Defendants move to dismiss the Tanasis' Complaint in its entirety.  Defendants argue that this Court lacks jurisdiction over the Tanasis' claims, requiring dismissal under Rule 12(b)(1).  In the alternative, Defendants argue that the Tanasis' claims should be dismissed for failure to state a claim under Rule 12(b)(6).

### A.  Motion to Dismiss for Lack of Jurisdiction under Rule 12(b)(1)

Defendants assert two arguments in support of their motion to dismiss under Rule 12(b)(1).

First, Defendants argue that the Tanasis' claims are prohibited by the *Rooker-Feldman* doctrine.

Second, Defendants argue that the Tanasis' claims are precluded by principles of *res judicata*.  The

Court examines each of these arguments in turn.

### 1.  The *Rooker-Feldman* Doctrine

CitiMortgage first argues that the Court lacks jurisdiction to review the Tanasis' claims under

the *Rooker-Feldman* doctrine. The Court disagrees.  The doctrine does not prevent jurisdiction over

the alleged violations of RESPA, nor does it prevent jurisdiction over the negligence and CUTPA

claims that are based on the same alleged misconduct.

The *Rooker-Feldman* doctrine provides that federal district courts do not have jurisdiction to

review final decisions of state courts or reverse or modify state court judgments. *See Rooker v.*

*Fidelity Trust Co.*, 263 U.S. 413, 415-16 (1923); *District of Columbia Court of Appeals v. Feldman*,

460 U.S. 462, 476 (1983).  Four requirements must be met for the doctrine to apply: "(1) the federal

court plaintiff must have lost in state court; (2) the plaintiff must complain of injuries caused by that

state court judgment; (3) the plaintiff must invite the district court to review and reject the judgment;

and (4) the state court judgment must have been rendered before the district court proceeding

commenced."  *Hoblock v. Albany Cnty. Bd. of Elections*, 422 F.3d 77, 85 (2d Cir. 2005).

Courts in the Second Circuit apply *Rooker-Feldman* to foreclosure actions.  *See Vossbrinck v.*

*Accredited Home Lenders, Inc.*, 773 F.3d 423, 427 (2d Cir. 2014) (applying *Rooker-Feldman* to

claims concerning fraud in the foreclosure process); *Gonzalez v. Ocwen Home Loan Servicing*, 74 F.

Supp. 3d 504, 514 (D. Conn. 2015) *reconsideration denied*, No. 3:14-CV-53 (CSH), 2015 WL

2124365 (D. Conn. May 6, 2015), *and aff'd sub nom. Gonzalez v. Deutsche Bank Nat. Trust Co.,* 632

F. App'x 32 (2d Cir. 2016) ("In the particular context of state court judgments of foreclosure, courts

in this circuit have consistently held that any attack on a judgment of foreclosure is clearly barred by

13

the *Rooker-Feldman* doctrine") (citation omitted) (collecting cases); *Beckford v. Citibank N.A.*, No. 00-CV-205 (DLC), 2000 WL 1585684, at *4 (S.D.N.Y. Oct. 24, 2000) (*Rooker-Feldman* doctrine prevented jurisdiction over the plaintiff's RESPA claim).

The Court, however, must engage in a "case-by-case determination of the applicability of the *Rooker-Feldman* doctrine," even in a case concerning a foreclosure. *See McCann v. Rushmore Loan Mgmt. Servs., LLC*, No. 15-CV-6502, 2017 WL 1048076, at *4 (E.D.N.Y. Mar. 16, 2017) (noting that "federal courts are not automatically barred from determining claims arising under RESPA merely because the state court has entered an order regarding the mortgage and property at issue," and collecting cases where courts did not apply the doctrine to RESPA claims).

The Tanasis lost in the Foreclosure Action, which was rendered before they filed their Complaint. *See* Notice of Judgment of Strict Foreclosure (entered March 7, 2016), Foreclosure Docket, 168.00; Compl. (filed May 16, 2016), ECF No. 1. The *Rooker-Feldman* doctrine applies, therefore, if *Hoblock*'s two "substantive" requirements, *Hoblock*, 422 F.3d at 85, are met: If the Tanasis "complain of injuries caused by" the Foreclosure Action, *Hoblock*'s second requirement, and "invite the [C]ourt to review and reject the judgment[,]" *Hoblock*'s third requirement. *Id.* at 86-87.

### a. The Tanasis' Claims

To assess the Tanasis claims under the two remaining *Rooker-Feldman* requirements, the Court must review the claims themselves. The Tanasis raise claims under RESPA, CUTPA, and of common law negligence. These claims do not satisfy either of *Hoblock*'s substantive requirements, making the *Rooker-Feldman* doctrine inapplicable.

Congress enacted RESPA "to insure that consumers throughout the Nation are provided with greater and more timely information on the nature and costs of the settlement process and are protected from unnecessarily high settlement charges caused by certain abusive practices that have developed in some areas of the country." 12 U.S.C. § 2601(a). In 2010, it amended the Act, creating the Consumer Financial Protection Bureau (the "CFPB"), which was tasked with prescribing rules

14

and regulations, as well as interpretations, "as may be necessary to achieve" RESPA's purpose. *See* Dodd–Frank Wall Street Reform and Consumer Protection Act, Pub.L. 111-203, § 2617(a), 124 Stat. 1376, 2184 (2010).  In 2013, the CFPB promulgated Regulation X, RESPA's implementing regulations.  *See* 12 C.F.R. §§ 1024.1–1024.41.

RESPA is a "consumer protection statute." *Roth v. CitiMortgage Inc.*, 756 F.3d 178, 181 (2d Cir. 2014) (per curiam) (citations omitted).  Both section 2605 of RESPA, which concerns the "servicing of mortgage loans and administration of escrow accounts," and Regulation X obligate loan servicers to disclose pertinent information to borrowers, attempt to correct errors in servicing, and respond to relevant questions from borrowers.  *See* 12 U.S.C. 2605, *et. seq*.  Regulation X also sets forth procedures that a servicer must follow when presented with a borrower's completed loss mitigation application. *See* 12 C.F.R. § 1024.41, *et. seq.*

Under RESPA, borrowers have a private right of action to enforce many of Regulation X's procedural requirements, as well as the statute itself.  The remedies available are set forth in Section 6(f) of RESPA, which provides for the recovery of monetary damages in the amount of "(A) any actual damages to the borrower as a result of the failure; and (B) any additional damages, as the court may allow, in the case of a pattern or practice of noncompliance with the requirements of this section, in an amount not to exceed $2,000." 12 U.S.C. § 2605(f).  The Tanasis claim damages under both subsections relating to CitiMortgage's alleged failure to respond to their communications and improper processing of their loss mitigation applications.

The Tanasis also claim that CitiMortgage was negligent in its handling and solicitation of mortgage modification requests and therefore raise a common law negligence claim.  They propose a duty of care established by the mortgage, RESPA, Regulation X, and a consent decree that allegedly binds CitiMortgage to follow certain procedures when processing mortgage modification requests.

CUTPA is also a consumer protection statute.  *Philip Morris, Inc. v. Blumenthal*, 123 F.3d 103, 106 (2d Cir. 1997) (citing *Witham v. ITT Hartford*, No. CV 960132891, 1997 WL 325443, at *1

15

(Conn. Super. Ct. June 4, 1997) ("purpose of CUTPA is to protect consumers from unfair trade practices). "CUTPA provides a statutory cause of action for any person who has suffered an ascertainable loss of money or property as a result of an unfair trade practice." *Bellemare v. Wachovia Mortgage Corp.*, 94 Conn. App. 593, 606 n. 6, 894 A.2d 335, 344 n. 6 (2006). In their third cause of action, the Tanasis claim that CitiMortgage violated CUTPA by misleading consumers about its loss mitigation policies, misleading consumers concerning the availability of loss mitigation policies, and "improperly charging Plaintiffs fees, interest, and other charges to which it [wa]s not entitled." Compl., ¶ 149(e).

### b.  The Tanasis do not Invite Review and Rejection of the Foreclosure Action

By asserting these three causes of action, the Tanasis do not invite this Court's review and rejection of the Foreclosure Action and therefore do not meet *Hoblock*'s third requirement. *Rooker-Feldman* precludes a district court from entertaining a suit that "would require the federal court to review [a state's] proceedings and determine that the foreclosure judgment was issued in error." *Vossbrinck*, 773 F.3d at 427.  In *Vossbrink*, the plaintiff claimed that the defendant bank, which had acquired a judgment of strict foreclosure against him in state court, fraudulently represented its standing to foreclose.  *Id.* at 426.  The court concluded that this would "require the federal court to review the state proceedings and determine that the foreclosure judgment was issued in error[,]" *id.* at 427, so that *Hoblock*'s second requirement had been met.  *Id.* ("[Vossbrink] is asking the federal court to determine whether the state judgment was wrongfully issued. … This would require the federal court to review the state proceedings and determine that the foreclosure judgment was issued in error.").

Under *Vossbrink*, the Court lacks jurisdiction over a plaintiff's allegation that a foreclosure was improperly obtained or that it was entered in error.  Courts have dismissed RESPA claims that challenge the foreclosure process itself.  *See Gordon v. Ocwen Loan Servicing*, No. 3:15-CV-

507(RNC), 2016 WL 1305108, at *1 (D. Conn. Mar. 31, 2016) (when plaintiff claimed "wrongful foreclosure" alongside RESPA violations and sought a temporary restraining order against the foreclosing bank, it was "evident [that] the purpose of this action is to undo the foreclosure"); *Saunders v. Rockville Bank*, No. 3:13-CV-01612-VLB, 2014 U.S. Dist. LEXIS 184582, at *16-17 (D. Conn. Sep. 10, 2014) ("[T]he relief sought by Plaintiff … would require this court to set aside the state court foreclosure judgment."); *Dunn v. Deutsche Bank Nat. Trust*, No. 5:15-CV-00809 DNH, 2015 WL 5638232, at *5 (N.D.N.Y. July 10, 2015), *report and recommendation adopted*, No. 5:15-CV-0809 DNH/TWD, 2015 WL 5650182 (N.D.N.Y. Sept. 24, 2015) (while "framed as violations of TILA and RESPA requirements, [plaintiff's] claims are inextricably intertwined with Plaintiff's claim that he was injured by the state court foreclosure judgment," because plaintiff sought injunction against foreclosure and argued that mortgage was "utterly void"); *but see McCann*, 2017 WL 1048076 at *4 (concluding that *Rooker-Feldman* did not bar the plaintiff's Complaint, because she "pointedly avoids seeking an order overturning the state court order regarding the foreclosure and sale, and instead seeks damages only as a result of Defendant's failure to comply with its [loss mitigation] obligations under RESPA."); *see also He v. Ocwen Loan Servicing, LLC*, 15-CV-4575, 2016 WL 3892405, at *2 (E.D.N.Y. July 14, 2016) (denying motion to dismiss RESPA claim concerning loss mitigation, without discussion of *Rooker-Feldman*, despite state court's foreclosure order); *Naylor v. Wells Fargo Home Mortg., Inc.*, No. 3:15-CV-116-RJC, 2016 WL 55292, at *5 (W.D.N.C. Jan. 5, 2016) (claims under RESPA were "independent from and not inextricably intertwined" with foreclosure judgment because they did "not seek to relitigate the foreclosure proceedings but rather [sought] civil damages for Defendants' alleged failure to comply with the federal statutes at the time of the origination of the underlying Note."); *McDonald v. J.P. Morgan Chase Bank, N.A.*, No. 12-CV-02749-MSK, 2014 WL 334813, at *5 (D. Colo. Jan. 30, 2014) (declining to dismiss plaintiff's RESPA claims concerning the defendant's responses to requests for information because they did not "turn on whether or not [the] foreclosure was proper.").

17

If a plaintiff "presents some independent claim," however, "albeit one that denies a legal conclusion that a state court has reached in a case to which he was a party[,] then there is jurisdiction." *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.,* 544 U.S. 280, 293 (2005). Thus, when a plaintiff states claims that are "independent from the state court judgment of foreclosure," *McCann*, 2017 WL 1048076 at *4, *Rooker-Feldman* does not deprive the court of jurisdiction. This is true "even if the [claims] involve the identical subject matter and parties as previous state-court suits." *Hoblock*, 422 F.3d at 86.

The Tanasis allege that Defendants improperly processed their loan modification applications, failed to respond to their requests for information, and "engaged in a pattern or practice of non-compliance with RESPA and Regulation X." Compl. ¶ 96. In all three causes of action, the Tanasis "pointedly avoid" arguing that their foreclosure was wrongly decided or seeking injunctive relief against the foreclosure. *See McCann*, 2017 WL 1048076 at *4. They argue, rather, that CitiMortgage committed independent violations of RESPA, CUTPA, Regulation X, and all of which grant the Tanasis independent rights as consumers and borrowers.

At this stage of the proceedings, the Court concludes the Tanasis' claims are sufficiently "independent" from the Foreclosure Action and do not invite the Court's "review and rejection of that judgment." *Hoblock*, 422 F.3d at 85; *see also Zeller v. Ventures Tr.*, No. 15-cv-01077, 2016 WL 745373 , at *21-22 (D. Colo. Feb. 1, 2016) (the plaintiff's claim for relief under RESPA and Regulation X was "independent" because it "alleges that [the defendant] failed to respond to a Qualified Written Request …. Nothing about Ms. Zeller's RESPA claim pertains to the foreclosure proceedings or would require the court to engage in appellate-type review of a state court judgment.").

### c. The Tanasis do not Complain of an Injury Caused by a State Court Judgment

The Tanasis' case presents a closer call when evaluated against *Hoblock*'s second requirement, which, as the Second Circuit has explained, is the "core requirement" of the *Rooker-Feldman* doctrine.  *Hoblock*, 422 F.3d at 87.  Under this second requirement, "*Rooker-Feldman* bars a federal claim, whether or not raised in state court, asserting an injury based on a state judgment and seeking review and reversal of that judgment.  *Id.* (noting that "such a claim is 'inextricably intertwined' with the state judgment," but cautioning that "the phrase 'inextricably intertwined' has no independent content.").  The court in *Hoblock* explained that:

> [A] federal suit complains of injury from a state-court judgment, even if it appears to complain only of a third party's actions, when the third party's actions are produced by a state-court judgment and not simply ratified, acquiesced in, or left unpunished by it. Where a state-court judgment causes the challenged third-party action, any challenge to that third-party action is necessarily the kind of challenge to the state judgment that only the Supreme Court can hear.

*Id.* at 88; *see also McKithen v. Brown*, 481 F.3d 89, 97-98 (2d Cir. 2007) ("What *Exxon* and *Hoblock* do make clear is that the applicability of the Rooker-Feldman doctrine turns not on the similarity between a party's state-court and federal-court claims[,] but rather on the causal relationship between the state-court judgment and the injury of which the party complains in federal court.").

The Second Circuit has observed that a plaintiff "is not complaining of an injury 'caused by' a state-court judgment when the exact injury of which the party complains in federal court existed prior in time to the state-court proceedings, and so could not have been 'caused by' those proceedings." *McKithen*, 481 F.3d at 98 (adding that "[o]bviously, an injury that arises at the same time or even after a state-court judgment might also arise independently of—that is, might arise without being caused by—that state-court judgment."); *see also Worthy-Pugh v. Deustche Bank Nat'l Trust Co.*, No. 3:14-CV-1620 (AWT), 2016 WL 2944535, at *5 (D. Conn. Jan. 29, 2016), *aff'd sub nom. Worthy-Pugh v. Deutsche Bank Nat'l Trust Co.*, 664 F. App'x 20 (2d Cir. 2016) (plaintiff's claim for "theft" of payments made under modification agreement "was not caused by the state court

judgment" and in fact occurred prior to the foreclosure judgment, making *Rooker-Feldman* inapplicable).

The Tanasis complain of injuries allegedly caused by CitiMortgage's improper servicing of their mortgage. While these errors may have shaped the eventual Foreclosure Action, they were not "produced by [the] state-court judgment." *Hoblock*, 422 F.3d at 88. At most, they were "simply ratified, acquiesced in, or left unpunished by it," *id.*, in that the state court allowed CitiMortgage to foreclose despite its alleged violations. Furthermore, the Tanasis do not request "title to and tender of [their] property," *Vossbrinck*, 773 F.3d at 427, but rather seek damages authorized by statute and allegedly produced by CitiMortgage's alleged deceptions, miscommunications, and delay. *See Sanchez v. Onewest Bank, FSB*, No. 11 CV 6820, 2013 WL 139870, at *3 (N.D. Ill. Jan. 10, 2013) (claims under RESPA were independent from foreclosure judgment because plaintiffs were "not seeking to relitigate those foreclosure proceedings but rather are seeking damages for defendants alleged failure to properly respond to their March 31, 2011 letter under RESPA"); *Hornbuckle v. Mortg. Elec. Registration Sys., Inc.*, No. 10-14306, 2011 WL 5509214, at *6 (E.D. Mich. Nov. 10, 2011) (court had jurisdiction over RESPA claim concerning defendant's response to the plaintiff's QWR, "because the source of the alleged injury is not the state court's decision" and is not "predicated upon the validity of the foreclosure").

The Court notes that the Complaint could be read to describe injuries produced by the Foreclosure Action. For example, the Tanasis allege that CitiMortgage's RESPA violation imposed "costs related to stripping the Property of equity," "unnecessary costs of maintaining the Property due to delayed foreclosure," and a "public record of foreclosure." *See* Compl. ¶¶ 61-65. The Tanasis also seek damages relating to their "emotional trauma," and cite a study that describes the emotional consequences of the foreclosure process. *Id.* at ¶¶ 139-40. At oral argument, the Tanasis maintained that these allegations were meant to approximate the damages that flow from the delay in foreclosure caused by CitiMortgage's alleged violations and insisted that they were not seeking damages relating

to the foreclosure itself.  Given that the Court "must … draw all reasonable inferences in favor of the party asserting jurisdiction" when reviewing a motion to dismiss under Rule 12(b)(1), it accepts the Tanasis' representation that they seek monetary damages totally unrelated to the Foreclosure Action, and concludes that their Complaint should not be dismissed under the *Rooker-Feldman* doctrine.  *See Tandon,* 752 F.3d at 243 ("In resolving a motion to dismiss under Rule 12(b)(1), the district court must take all uncontroverted facts in the complaint (or petition) as true, and draw all reasonable inferences in favor of the party asserting jurisdiction, [although] the party asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists").

## 2.  Res Judicata

Defendants also argue that dismissal is warranted under the doctrine of *res judicata*, because "all of Plaintiffs claims in the instant matter were raised, or could have been raised, in the Foreclosure Action."  CitiMortgage's Mot., 11.  The Tanasis respond that their claims cannot be precluded because they were not required to bring any of them in state court and were in fact barred from bringing some of them.  Opp. Mem., 11.  The Court agrees that *res judicata* bars most of the Tanasis claims.

The doctrine of *res judicata* provides that "a final judgment, when rendered on the merits, is an absolute bar to a subsequent action, between the same parties or those in privity with them." *Mazziotti v. Allstate Ins. Co.*, 240 Conn. 799, 812, 695 A.2d 1010 (Conn. 1997); s*ee also Vandever v. Emmanuel*, 606 F. Supp. 2d 253, 254 (D. Conn. 2009) ("*Res judicata*, or claim preclusion, means that a party may not split causes of action that could be brought and resolved together") (internal citations omitted).

State court judgments have *res judicata* effect in federal courts.  *Migra v. Warren City School Dist.*, 465 U.S. 75, 85 (1984).  In evaluating the *res judicata* effects of a previous state court judgment, federal courts apply that state's rule of law as to *res judicata*.  *Id.*  "It is now settled that a federal court must give to a state-court judgment the same preclusive effect as would be given that

21

judgment under the law of the State in which the judgment was rendered." *Id.* at 81 (internal

quotations and citations omitted); *see also AmBase Corp. v. City Investing Co. Liquidating Trust*, 326

F.3d 63, 72 (2d Cir. 2003) ("Where there is a final state court judgment, a federal court looks to that

state's rules of *res judicata* to determine the preclusive effect of that judgment.").

The Tanasis correctly note that Connecticut is a permissive counterclaim jurisdiction.

Connecticut courts are mixed as to whether a plaintiff is precluded by the *res judicata* doctrine from

bringing a claim that she could have brought, but was not required to bring, as a counterclaim in a

previous action.  The majority of courts, though, apply *res judicata* to permissive counterclaims,

keeping in mind "the public policy that a party should not be able to relitigate a matter which it

already has had an opportunity to litigate." *Weiss v. Weiss*, 297 Conn. 446, 459-60 (Conn. 2010); *see*

*generally Dunham v. Dunham*, 221 Conn. 384, 391-92 (1992) (*res judicata* barred prosecution of

claims that could have been brought as counterclaims, because "'[t]he doctrine … provides that a

former judgment serves as an absolute bar to a subsequent action involving any claims relating to

such cause of action which were actually made or which might have been made.'") (citing *Gagne v.*

*Norton*, 189 Conn. 29, 32 (1983)); *but see Trimmel v. Gen. Elec. Credit Corp.*, 555 F. Supp. 264, 267

(D. Conn. 1983) ("Under Connecticut law, Trimmel's Truth-in-Lending claim is a permissive rather

than compulsory counterclaim to the state foreclosure action. With state law in this posture, federal

courts would not bar Trimmel's Truth-in-Lending claim because she failed to assert it as a

counterclaim in the state suit.") (internal citations omitted); *State v. Bacon Const. Co*., 160 Conn.

App. 75, 88 (2015) ("In Connecticut, the fact that a defendant in a prior action did not assert a related

cause of action in that prior action does not foreclose the defendant from asserting those claims in a

new action filed in the future"); *Hansted v. Safeco Ins. Co. of Am*., 19 Conn. App. 515, 521 (1989)

("Because Connecticut does not have a compulsory counterclaim rule … Hansted cannot be

precluded from bringing the present claim on the ground that he failed to bring a counterclaim in [a

prior action]"); *Battista v. DeNegris*, No. CV93-0525774, 1994 WL 530165, at *1 (Conn. Super. Ct.

Sept. 16, 1994) (noting that *res judicata* is aimed at preventing duplicative suits by plaintiffs, but

cannot bar previous defendants from bringing a potential counterclaim in a separate action, because

"we live for better or worse in a so-called permissive counterclaim state.").

Rather than concluding that res judicata can never apply to permissive counterclaims, most

Connecticut courts use a transactional test for determining whether *res judicata* should apply. *See*

*Weiss,* 297 Conn. at 460-61; *Chien v. Skystar Bio Pharmaceutical Co.,* 623 F. Supp. 2d 255, 260 (D.

Conn. 2009) (*res judicata* "bars not only those claims or legal theories that were asserted in the prior

action, but also those legal claims or theories that could have been asserted, regardless whether they

were in fact raised by the parties, so long as they arise from the same transaction that formed the

basis of the prior action.") (quoting *Balderman v. U.S. Veterans Admin.,* 870 F.2d 57, 62 (2d

Cir.1989)); *Legassey v. Shulansky*, 28 Conn. App. 653, 656 (Conn. App. Ct. 1992) (same). "The

transactional test measures the preclusive effect of a prior judgment, which includes any claims

relating to the cause of action that were actually made or might have been made." *Weiss,* 297 Conn.

at 461. "What factual grouping constitutes a 'transaction' [is] to be determined pragmatically, giving

weight to such considerations as whether the facts are related in time, space, origin, or motivation,

whether they form a convenient trial unit, and whether their treatment as a unit conforms to the

parties' expectations or business understanding or usage." *Id.* According to this transactional test,

several of the Tanasis' claims are precluded and therefore dismissed under the doctrine of *res*

*judicata.*

### a. The Transaction Test and Foreclosure Actions

Connecticut courts also use the transaction test to evaluate the viability of counterclaims in

foreclosure actions, thereby providing a guide to the test's application in the foreclosure context.

*CitiMortgage, Inc. v. Rey*, 150 Conn. App. 595, 605 (2014) (In foreclosure actions, a "counterclaim

must simply have a sufficient relationship to the making, validity or enforcement of the subject note

or mortgage in order to meet the transaction test."). When applying the transaction test in this

23

context, courts "have required only that the subject of the counterclaims have a sufficient connection to the making, validity or enforcement of the note and mortgage." *Id.*

Claims questioning the validity of the plaintiff's right to seek foreclosure are sufficiently connected to the foreclosure action. In *Rey*, CitiMortgage sought to foreclose on a residential property before the Connecticut Superior Court. *Rey*, 150 Conn. App. at 597. The defendant, Rey, asked to participate in the court's foreclosure mediation process, and the court granted her request and stayed the foreclosure proceedings. *Id.* at 598. During mediation, the parties entered into a forbearance agreement. *Id.* When CitiMortgage later instituted a foreclosure action, the defendant, by way of counterclaim, alleged that the foreclosure action violated the parties' forbearance agreement. *Id.* at 599. The court decided that this counterclaim arose from the same transaction as the foreclosure action. *Id.* at 608. The court reasoned that the parties had entered into the forbearance agreement during litigation and in regard to the subject of the note and mortgage. *Id.* Furthermore, the forbearance agreement "directly implicat[ed] the plaintiff's right, in equity, to seek the remedy of a judgment by foreclosure." *Id.*; *see also Morgera v. Chiappardi*, 74 Conn. App. 442, 458-59 (2003) (holding that a counterclaim regarding false representations about the plaintiff's other properties "had arisen from the same transaction as the subject mortgage and note because there was an adequate nexus between the transactions [because plaintiff's] conduct in inducing the defendant's making of the note and mortgage on the property [raised] serious questions about their validity and enforcement").

Claims relating to a broad range of conduct, or to an extrinsic agreement between the parties, rather than "narrowly bearing on the mortgage note itself or its enforcement," do not pass the transaction test. *JP Morgan Chase Bank v. Rodrigues*, 109 Conn. App. 125, 134-35 (2008). In *Rodrigues*, the court found that the defendants' counterclaim for "emotional distress as a result of [the plaintiff's] threats of foreclosure and the [] alleged requirement that the defendants execute another agreement" was not sufficiently related to the foreclosure action to be brought as a

24

counterclaim. *Id.*  Rather, the court held, the counterclaim "pertain[ed] to a range of the plaintiff's conduct … rather than narrowly bearing on the mortgage note itself or its enforcement." *Id.* at 133 (noting "[t]he disparity between the subject matter of the plaintiffs' complaint and that of the defendants' counterclaim.").  The court also noted that the counterclaim involved "documents other than the mortgage note." *Id.* at 133; *see also Rey*, 92 A.3d at 286 (emphasizing the difference between the instant case and *Rodrigues*, where "the defendant had claimed damages resulting from the plaintiff's failure to adhere to an extrinsic agreement").

Similarly, in *U.S. Bank National Assn. v. Sorrentino*, which the Tanasis cite, the borrowers' allegations regarding the bank's improper conduct during a foreclosure mediation program could not have been properly joined with their complaint.  158 Conn. App. 84, 95 (2015), *cert. denied*, 319 Conn. 951 (2015).  The *Sorrentino* defendants claimed that the plaintiff bank was negligent during foreclosure mediation proceedings and had deliberately failed to provide certain documents. *Id.* at 85.  The court concluded that the plaintiffs could not bring counterclaims concerning mediation proceedings in the foreclosure action. *Id.* at 97. The court held that, because the mediation program did not begin until after the bank executed the note and mortgage and commenced the foreclosure action, claims concerning the mediation program did not "reasonably relate" to "the subject matter of the underlying complaint," namely "the execution of the note and mortgage, and the subsequent default." *Id.* at 96-97 ("That program did not begin until after the execution of the note and mortgage, and after the foreclosure action was commenced, and, thus, does not reasonably relate to the making, validity or enforcement of the note or mortgage").

Under the transaction test, RESPA claims are proper counterclaims to foreclosure actions when "the alleged RESPA violations arise out of the same transaction that is the subject of the foreclosure action, that is, the execution of the note and mortgage and the subsequent default." *Webster Bank v. Linsley*, No. CV970260406S, 2001 WL 1042581, at *9 (Conn. Super. Ct. Aug. 14, 2001).  In *Webster Bank*, the state superior court confirmed that RESPA claims could be

counterclaims, but not special defenses, to foreclosure actions. *Id.* ("The court also disagrees with the plaintiff's argument that because RESPA violations cannot affect the validity or enforceability of the note and mortgage, that is, serve as a special defense to foreclosure, they cannot, *ipso facto*, form the basis of a counterclaim in mortgage foreclosure").

"Even though the alleged RESPA violations cannot affect the validity or enforceability of the note and mortgage," the court held "they may relate to the making of the note and mortgage or the default" and qualify as counterclaims. *Webster Bank*, 2001 WL 1042581, at *9; *see also Deutsche Bank Nat'l Tr. Co. v. Ofili,* No. CV146022822, 2015 Conn. Super. LEXIS 1760, at *53 (Super. Ct. July 2, 2015) ("Connecticut trial courts have permitted counterclaims based upon RESPA in cases involving foreclosure."); *EMC Mortg. Corp. v. Shamber*, No. CV075001252S, 2009 WL 4282900, at *13 (Conn. Super. Ct. Nov. 12, 2009) (agreeing that RESPA claims, and negligence claims arising from duties created by RESPA, could be counterclaims in foreclosure actions, but striking the RESPA counterclaim because "the failure to send a notice of the transfer of the servicing of the loan and to credit payments made under a forbearance agreement do not arise from the execution of the note and mortgage and the subsequent default."); *Bankers Tr. Co. v. Dexter*, No. CV351023S, 1998 Conn. Super. LEXIS 3544, at *6 (Super. Ct. Dec. 14, 1998) (denying motion to strike RESPA counterclaims in foreclosure action when "violations occurred in connection with the defendants' loan application and the overall loan transaction"); *Bank of Am., N.A. v. Derisme*, No. CV096003691, 2014 Conn. Super. LEXIS 1820, at *31 (Super. Ct. July 22, 2014) (denying motion to strike RESPA counterclaims involving the plaintiff's response to a qualified written request).

Similarly, defendants can assert CUTPA violations as counterclaims if they "relate to the making, validity or enforcement" of the underlying mortgage.  In *Rodrigues*, the court held that the defendant's CUTPA counterclaim did not "arise out of the same transaction as the complaint." *Rodrigues*, 109 Conn. App. at 133 (citing *New Haven Savings Bank v. LaPlace*, 66 Conn. App. 1, 9-11 (2001), *cert. denied*, 258 Conn. 942 (2001)). The court recognized, though, that there were

"instances in which violations of CUTPA have been upheld as valid counterclaims brought in foreclosure actions." *Id.; see also Monetary Funding Grp. v. Pluchino*, 87 Conn. App. 401, 412 (2005) (reviewing CUTPA counterclaim to foreclosure action); *Bank of Am., N.A. v. Groton Estates, LLC*, No. CV096001697, 2010 WL 3259815, at *4 (Conn. Super. Ct. July 13, 2010) (Super. Ct. July 13, 2010) (recognizing that CUTPA could be invoked in counterclaims, but finding that "plaintiff's conduct, in refusing to negotiate with the defendants and proceeding to foreclosure, simply does not rise to the level of a violation of CUTPA.").

### b. The Tanasis's Claims

Defendants argue that the Tanasis raise claims that arise out of the "same core of operative facts that gave rise to the Foreclosure Action," and that their claims "were raised, or could have been raised," in that proceeding. CitiMortgage's Mot., 11; M&T's Mot., 9. The Tanasis assert that their allegations do not "negate" any of the elements of a foreclosure claim and that they could not have brought their RESPA allegations in the foreclosure action all. Opp. Mem., 12. The Court agrees with Defendants regarding most, but not all, of the Tanasis' claims.

Most of the Tanasis' claims involve Defendants' failure to respond to loan modification or loss mitigation applications. The Tanasis allege that CitiMortgage failed to respond to their pending applications and closed their applications without reviewing them. *See* Compl. ¶¶ 66-90. Unlike the counterclaims at issue in *Sorrentino*, these allegations were part of a pattern or practice of conduct that began, by the Tanasis' own admission, in 2009, before the Foreclosure Action. *Id.* at ¶ 1. Indeed, the Tanasis raised some of these issues in their "Motion to Open and Set Aside Summary Judgment and to Strike Summary Judgment." *See* Motion to Open and Set Aside Summary Judgment, CitiMortgage's Mot., Ex. F, ECF No. 26-7. [2] There, the Tanasis alleged that the

---

[2] The Tanasis assert that their dual-tracking claims were made in a motion for temporary injunctive relief, which is not a final judgment for *res judicata* purposes. *See* Opp Mem., 16 ("The grant or denial of a post-judgment application for temporary injunctive relief does not support a res judicata or collateral estoppel defense because it is not an adjudication on the merits."). The Tanasis invoked Regulation X in a motion to set aside the summary

Defendants violated Regulation X's prohibition on "dual tracking" by filing for summary judgment without rendering a decision on the Tanasis' pending loss mitigation applications.  *Id.* at 6.

Furthermore, like the counterclaims in *Rey*, the Tanasis' allegations that Defendants improperly or negligently processed their requests to reduce their mortgage relate to the underlying amount of the note and mortgage and "directly implicate" the eventual foreclosure judgment.  *Rey*, 140 Conn. App. at 608.  If the Court found that CitiMortgage should have considered the Tanasis' mortgage modification requests earlier, its ruling would call into question the state court's judgment in the Foreclosure Action.  These claims are too related to the Foreclosure Action for the Tanasis to raise them now.[3]

---

judgment decision and enjoin CitiMortgage from filing further such motions until it processed the Tanasis' modification applications.  *See* Motion to Open and Set Aside Summary Judgment, 7.  A court's decision on a motion to set aside a summary judgment motion has the same finality as a decision on a motion for summary judgment.  "A judgment otherwise final for purposes of the law of res judicata is not deprived of such finality by the fact that time still permits commencement of proceedings in the trial court to set aside the judgment and grant a new trial or the like; nor does the fact that a party has made such a motion render the judgment non-final."  Restat. 2d of Judgments, § 136; *see also Zabelle v. Coratolo*, 816 F. Supp. 115, 120 (D. Conn. 1993) ("The standard for determining whether the Superior Court's decision is a final judgment" for estoppel purposes under Connecticut law is defined by the Restatement (Second) of Judgments.").

[3] The *res judicata* doctrine applies to Defendant M&T, although it was not a party in the foreclosure action.  Under the doctrine of *res judicata*, "a final judgment, when rendered on the merits, is an absolute bar to a subsequent action, between the same parties or those in privity with them, upon the same claim."  *Dontigney v. Roberts*, 73 Conn. App. 709,710 (2002).  "A key consideration in determining the existence of privity is the sharing of the same legal right by the parties allegedly in privity."  *Tibbets v. Stempel*, 354 F. Supp. 2d 137, 148 (D. Conn. 2005) (quoting *Joe's Pizza, Inc. v. Aetna Life & Cas. Co*., 236 Conn. 863, 868, 675 A.2d 441, 445 (Conn. 1996)).  "Generally, an employer-employee or agent-principle [sic] relationship will provide the necessary privity for claim preclusion with respect to matters within the scope of the relationship, no matter which party is first sued." Id. (quoting 18 Moore's Fed. Prac. 3d § 131.40[3][f] (Matthew Bender ed.)).  An assignee of a mortgagee is also in privity with the assignor for res judicata purposes.  *See, e.g. Worthy-Pugh v. Deutsche Bank Nat'l Trust Co*., 664 F. App'x 20 (2d Cir. 2016) (*res judicata* barred mortgagor's claim against mortgagee's assignee for extrinsic fraud, arising out of foreclosure proceedings, where, under Connecticut law, mortgagor could have raised fraud claim as defense to foreclosure proceedings in state court.); *Omotosho v. Freeman Inv. & Loan,* 136 F. Supp. 3d 235, 249 (D. Conn. 2016) ("CitiMortgage and the plaintiff were parties to the action, and MERS is in privity with CitiMortgage because assignors are in privity with assignees.").  The Tanasis allege that the CitiMortgage was under the "direct supervision, employ, and control" of Hudson—M&T's predecessor—when it "committed the wrongful and negligent acts described in the Complaint."  Compl. at ¶¶ 5, 46.  Because the Tanasis have alleged an agent-principal relationship between CitiMortgage and Hudson, *Tibbets*, 354 F. Supp. 2d at 148, and an assignor-assignee relationship between Hudson and Defendant M&T Bank, *Worthy-Pugh*, 664 F. App'x at 20, they allege the required privity.  Based on the allegations in the Complaint, M&T Bank and CitiMortgage "shared the same legal right" in the Foreclosure Action, and the Action has *res judicata* effect against M&T Bank.

Some of the Tanasis' claims, however, are separate from the Foreclosure Action and therefore survive Defendants' motion to dismiss.  These claims arise from interactions between the parties that were unrelated to the Foreclosure Action and conduct that occurred after the proceedings had commenced.  The Tanasis could not have maintained these claims as counterclaims in the Foreclosure Action and may bring them now.

Where does this leave the Tanasis?  In their first cause of action, the Tanasis allege that CitiMortgage violated RESPA and Regulation X by failing to acknowledge or properly review loss mitigation applications (Compl., ¶¶ 71-81), by failing to properly respond to the Tanasis' requests for information (*id.* at ¶¶ 83-85), mortgage modification applications (*id.* at ¶ 86), and qualified written requests (*id.* at ¶ 87), and by engaging in a pattern or practice of non-compliance with RESPA (*id.* at ¶¶ 96-97).  The claims concerning the Tanasis' loss mitigation and mortgage modification applications must be dismissed under *res judicata*, because they "reasonably relate [to] the execution of the note and mortgage, and the subsequent default." *Sorrentino*, 58 Conn. App. at 96-97.  The remaining claims, however, do not "narrowly bear[] on the mortgage note itself or its enforcement," *Rodrigues*, 109 Conn. App. at 134, and survive Defendants' motion to dismiss on this ground.

In their second cause of action, the Tanasis allege that CitiMortgage negligently failed to review mortgage modification requests (*id.* at ¶¶ 109-114), negligently failed to provide a single point of contact to the Tanasis (*id.* at ¶¶ 119-127), and "continually" and "actively" solicited mortgage modification applications that it never intended to consider, seeking to accrue higher interest rates by postponing the Tanasis' inevitable default (*id.* at ¶¶ 132-134).  The allegations regarding CitiMortgage's negligent provision of a single point of contact and negligent solicitation of mortgage modification applications do not relate to the "making, validity or enforcement of the mortgage note," *Rodrigues*, 109 Conn. App. at 133, and are not barred by *res judicata*.  The Tanasis, however, cannot make claims concerning Defendants' negligent processing of their loss mitigation or mortgage modification applications.

In the third cause of action, the Tanasis claim that CitiMortgage violated CUTPA by misleading consumers about its loss mitigation policies (*id.* at ¶ 157), soliciting mortgage modification applications and demanding "large amounts of sensitive personal information," only to deny these applications without review (*id.* at ¶¶ 149, 159), misleading consumers concerning the availability of loss mitigation policies, and "requesting duplicative, unnecessary, or updates to documentation during the application process" (*id.* at ¶ 149(b)).  These claims are not transactionally related to the Foreclosure Action and therefore should not be dismissed under *res judicata*.  The Tanasis also claim that CitiMortgage violated CUTPA by unfairly applied its existing loss mitigation policies (*id.* at ¶ 149(d)).  This claim "directly implicates" the eventual foreclosure judgment, *Rey*, 140 Conn. App. at 608, and is therefore dismissed.

### B.  Motion to Dismiss under Rule 12(b)(6)

The Court has held that many of the Tanasis' claims fail under *res judicata*.  Whether or not Defendants' allegedly improper processing of the Tanasis' loan modification applications violated RESPA, any complaints about that process could have been raised in the Foreclosure Action and cannot be adjudicated here.  Some claims remain, however, and Defendants have moved to dismiss these claims under Rule 12(b)(6).[4]

CitiMortgage argues that the Tanasis' RESPA claims should be dismissed because (1) the Tanasis do not allege sufficient actual or statutory damages under RESPA; (2) the Tanasis fail to state a claim concerning CitiMortgage's response to their January 13, 2014 loss mitigation application; (3) the Qualified Written Requests ("QWRs") on which the Tanasis' base their RESPA

---

[4] The remaining claims that have not been dismissed under Rule 12(b)(1) are the following: Count One, RESPA claims concerning CitiMortgage's responses to the Tanasis' requests for information (Compl. ¶¶ 83-85), qualified written requests (*id.* at ¶ 87), and notices of error (*id.* at ¶¶ 43, 45), as well as pattern or practice claims under RESPA (*id.* at ¶¶ 96-97); Count Two, negligence claims concerning CitiMortgage's failure to provide a single point of contact to the Tanasis (*id.* at ¶¶ 119-127), and solicitation of the Tanasis' mortgage modification applications (*id.* at ¶¶ 132-134); and Count Three, all of the Tanasis' CUTPA claims besides the claim that CitiMortgage violated CUTPA by unfairly applied its existing loss mitigation policies (*id.* at ¶ 149(d)).

claims do not trigger RESPA liability; (4) CitiMortgage's responses to the Tanasis Requests for

Information ("RFIs") were adequate under RESPA; (5) CitiMortgage appropriately responded to the

Tanasis' Notices of Error ("NOEs"), and (6) CitiMortgage was not required to comply with

Regulation X when processing the Tanasis' loss mitigation application.  CitiMortgage also argues

that the Tanasis (7) do not adequately allege that CitiMortgage was not diligent in processing their

loss mitigation applications.  Regarding the Tanasis' other claims, CitiMortgage argues that (8) it did

not owe a duty of care to the Tanasis and did not proximately cause their injuries, mandating

dismissal of the negligence *per se* claim as well as (9) the negligent infliction of emotional distress

claim, and (10) the Tanasis' CUTPA claims are legally inadequate and time-barred.  *See*

CitiMortgage's Mot., 11-27.  Defendant M&T incorporates CitiMortgage's arguments, but adds that

the Tanasis have "failed to state a cause of action for which M&T can be vicariously liable" for

CitiMortgage's alleged violations.  M&T's Mot., ECF No. 25-1, 11.

As discussed above, the Court does not have jurisdiction over any claims concerning

CitiMortgage's processing of the Tanasis' loss mitigation applications.  Accordingly, it will not

review CitiMortgage's arguments numbered (2), (6), and (7), because the related claims have been

dismissed.  It reviews the rest of CitiMortgage's arguments as well as M&T's about vicarious

liability, and concludes that the Tanasis have stated a claim under RESPA, by way of Regulation X,

and under CUTPA.  They have also stated a cause of action for negligence.  Finally, the Court cannot

dismiss the Tanasis' claim that M&T was vicariously liable for CitiMortgage's alleged misconduct.

While the Tanasis' Complaint may not be dismissed, their damages are limited, as the Court

describes below.

### 1.   The Tanasis' RESPA Claims

The Tanasis' remaining RESPA claims concern CitiMortgage's obligations to respond to

certain communications from borrowers.  The Tanasis bring these claims under section 2605(e) of

the statute, which requires that servicers of "federally related mortgage loan[s]" respond in a

prescribed time and manner to "qualified written requests" from borrowers, *see* 12 U.S.C. § 2605(e), and Regulation X, its implementing regulation.  *See* Opp. Mem., 17.

The Tanasis claim that CitiMortgage violated several sections of Regulation X, including 12 C.F.R. § 1024.35, which provides "error resolution procedures" (Opp. Mem., 18); 12 C.F.R. § 1024.36, which concerns "requests for information" (*id.* at 16); and 12 C.F.R. § 1024.41, which sets out "loss mitigation procedures" (Compl. ¶ 70).  RESPA provides that "[a] servicer of a federally regulated mortgage shall not ... fail to comply with any other obligation found by the [CFPB], by regulation, to be appropriate to carry out the consumer protection purposes of this chapter." 12 U.S.C. 2605(k)(1)(E).

Because the Court does not have jurisdiction over the Tanasis' claims concerning the processing of their loss mitigation applications, it only addresses CitiMortgage's motion to dismiss to the extent that it pertains to the Tanasis' claims under 12 U.S.C. § 2605(e), 12 C.F.R. § 1024.35, and 12 C.F.R. § 1024.36.  CitiMortgage's Mot., 16-18.  The Second Circuit has not yet addressed these provisions of RESPA or Regulation X.  The Court therefore draws from the decisions of district courts in this Circuit and others when evaluating the Tanasis' claims, but is ultimately bound only by this Circuit's requirement that the Complaint "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Fink v. Time Warner Cable*, 714 F.3d 739, 741 (2d Cir. 2013) (citing *Ashcroft*, 556 U.S. at 678).

### a.  CitiMortgage's Liability under 12 U.S.C. § 2605(e)

The Tanasis allege that CitiMortgage violated RESPA by improperly responding to several of their qualified written requests for information ("QWRs").  Specifically, they point to their January 13, 2014 and March 5, 2015 letters to CitiMortgage, which "sought information pertaining to the payoff of their loan and the holder of the Note." Compl., ¶¶ 21, 34.  CitiMortgage argues that these claims should be dismissed because the Tanasis have not proven that CitiMortgage received these

requests, and because "these requests do not relate to the servicing of their loan and thus … are not QWRs." CitiMortgage's Mot., 15.  The Court agrees.

RESPA requires servicers of federally related mortgage loans to comply with certain disclosure requirements after receiving a qualified written request ("QWR"). 12 U.S.C. § 2605(e).  A QWR is "a written correspondence, other than notice on a payment coupon or other payment medium supplied by the servicer, that--

>  (i)    includes, or otherwise enables the servicer to identify, the name and account of
>          the borrower; and
>
>  (ii)   includes a statement of the reasons for the belief of the borrower, to the extent
>          applicable, that the account is in error or provides sufficient detail to the
>          servicer regarding other information sought by the borrower."

12 U.S.C. § 2605(e)(1)(B). A servicer is required to respond to a QWR from a borrower only to the extent that the QWR seeks "information relating to the servicing of [the] loan." 12 U.S.C. § 2605(e)(1)(A).  "Servicing" is defined as "receiving any scheduled periodic payments from a borrower pursuant to the terms of any loan[,] and making the payments of principal and interest and such other payments with respect to the amounts received from the borrower as may be required pursuant to the terms of the loan." 12 U.S.C. § 2605(i)(3).

To plead a claim for failure to respond to QWRs under RESPA, a plaintiff must offer proof by "attaching the letter or pleading with specificity such facts—such as when the letter was sent and to whom it was directed, why it was sent, and the contents of the letter—[so] that the Court may determine if the letter qualifies as a QWR or notice of error." *Kilgore v. Ocwen Loan Servicing, LLC*, 89 F. Supp. 3d 526, 538 (E.D.N.Y. 2015).

The Tanasis allege that they "mailed a qualified written request for information about the payoff of their loan and the holder of their note" to CitiMortgage on January 13, 2014 and March 5, 2014. Compl. ¶ 21.  CitiMortgage argues that this claim should be dismissed because the Tanasis

33

have not alleged that CitiMortgage received the letter.[5]  CitiMortgage's Mot., 14.  The Tanasis are correct that "there is a presumption in this circuit that a mailed document is received three days after its mailing, when the person who mailed the document followed regular office practice and procedure or has actual knowledge of having mailed the document."  *Meckel v. Continental Res. Co.*, 758 F.2d 811, 817 (2d Cir. 1985). This presumption may be rebutted by admissible evidence, but "the mere denial of receipt does not rebut that presumption."  *Id.* at 817; *see also Lage v. Ocwen Loan Servicing LLC*, 145 F. Supp. 3d 1172, 1191-92 (S.D. Fla. 2015), *aff'd*, No. 15-15558, 2016 WL 5864507 (11th Cir. Oct. 7, 2016) (allowing claim regarding plaintiffs' Notice of Error ("NOE") to survive summary judgment despite a "soft conflict with Plaintiffs' assertion that the Ocwen's response to their NOE was never received" because "this conflict is not so profound as to undermine the entirety of the Complaint and leave Ocwen blind as to what obligations it has allegedly evaded"). The Tanasis have stated a claim, even though they do not specifically allege that CitiMortgage received the letter.

CitiMortgage also argues that the Tanasis' letters, which requested "information about the payoff of their loan and the holder of their note," Compl. ¶ 12, did not concern "servicing." CitiMortgage's Mot., 16.   The Court agrees with CitiMortgage.

Federal regulations define a payoff statement as an "accurate statement of the total outstanding balance that would be required to pay the consumer's obligation in full as of a specified date."  *See Truth in Lending (Regulation Z)*, 76 Fed. Reg. 79772 (Dec. 22, 2011), 12 CFR § 1026(a). The CFPB further explains that "a payoff statement is necessary any time a borrower repays a mortgage loan, and servicers routinely provide payoff statements for borrowers to refinance or pay in full their mortgage loan obligations." *Mortgage Servicing Rules*, 78 FR at 10742.  RESPA's

---

[5] CitiMortgage raises this argument when discussing a loss mitigation application that the Tanasis allegedly mailed on January 13, 2014.  The Court addresses it here to the extent that it impacts CitiMortgage's motion to dismiss the Tanasis' QWR claim as well.

definition of "servicing" references "scheduled" and "periodic" payments, as well as "payments with respect to the amounts received from the borrower as may be required pursuant to the terms of the loan." 12 U.S.C. § 2605(i)(3).  A payoff statement does not relate to a borrower's periodic payments and is not necessary for routine servicing, but rather for paying the loan in full.  Such a request does not relate to "servicing" under RESPA. *See e.g., Mohamed v. Select Portfolio Servicing, Inc*., 215 F. Supp. 3d 85, 98-99 (D.D.C. 2016) ("As none of the information Plaintiff requested from Defendant—a payoff statement, a certified copy of the Note, the identity of the loan's owner, and an opportunity to physically inspect the Note—constituted information related to servicing, Plaintiff's QWR did not trigger the response requirements."); *Hudgins v. Seterus, Inc*., 2016 WL 3636859, at *6 (S.D. Fla. June 29, 2016) (request for "a current pay off statement" did not concern servicing).

Furthermore, in its official commentary on Regulation X, the CFPB states that it intended the Truth in Lending Act, as implemented by Regulation Z, to be the sole source of servicers' obligations concerning payoff statements.  The CFPB notes that "the failure to provide a payoff balance is an error only in those circumstances in which TILA section 129G, as implemented by § 1026.36(c)(3) of the 2013 TILA Servicing Final Rule, applies," and adds that "there would be little consumer benefit to subjecting servicers to potentially overlapping standards under TILA and RESPA as to the provision of a payoff statement."  *Mortgage Servicing Rules*, 78 FR at 10742; *see also Bracco v. PNC Mortg*., No. 8:16-CV-1640-T-33TBM, 2016 WL 4507925, at *5 (M.D. Fla. Aug. 29, 2016) ("The request for a current payoff statement cannot transform Bracco's RFI into a QWR related to "servicing" of a loan. The Truth in Lending Act (TILA), rather than RESPA, imposes the requirement on servicers of home loans to provide payoff statements to borrowers.").  Given the CFPB's interest in avoiding "overlapping standards," the Court concludes that the request for a payoff statement did not concern "servicing" under RESPA.

CitiMortgage also asserts that the Tanasis' inquiry into the owner of their mortgage does not concern servicing.  District courts have come to different conclusions about whether communications

35

regarding the holder of a mortgage note pertain to "servicing." *See Wolfbauer v. Ocwen Loan Servicing, LLC*, No. 4:15CV3141, 2016 WL 1170982, at *3 (D. Neb. Mar. 24, 2016) ("An inquiry about the validity, ownership, transfer, assignment, or potential modification of a loan is not 'related to the servicing' of the loan and does not constitute a QWR.") (collecting cases); *Kelly v. Fairon & Assoc.,* 842 F.Supp.2d 1157, 1160 (D. Minn. 2012) ("Requests for information pertaining to the identity of a note holder ... do not relate to servicing."); *Devary v. Countrywide Home Loans, Inc*., 701 F. Supp. 2d 1096, 1108 (D. Minn. 2010) (explaining that "ownership of the loan" does not relate to servicing); *Consumer Sols. REO, LLC v. Hillery*, 658 F. Supp. 2d 1002, 1014 (N.D. Cal. 2009) ("That a QWR must address the servicing of the loan, and not its validity, is borne out by the fact that § 2605(e) expressly imposes a duty upon the loan servicer, and not the owner of the loan."); *Marsh v. BAC Home Loans Servicing, LP*, 2011 WL 1196415, at *8 n.8 (M.D. Fla. Mar. 29, 2011) (note-ownership information did not relate to "servicing" of loan); *but see Watson v. Bank of Am., N.A.*, No. 16CV513-GPC(MDD), 2016 WL 3552061, at *8 (S.D. Cal. June 30, 2016) ("A request for information for the identity of the owner of the loan falls under RESPA and Regulation X."); *Davis v. Greenpoint Mortg. Funding, Inc*., 09cv2719-CC-LTW, 2011 WL 7070222, at *3 (N.D. Ga. Sept. 19, 2011) (concluding that the identity of the owner of a mortgage related to "servicing," and observing that contrary decisions provide "little, if any, analysis ... regarding why the identity of the entity for whom a loan servicer is receiving payments is not related to servicing."); *Woods v. Greenpoint Mortg. Funding, Inc*., No. CIV. 2:09-1810 WSB KJM, 2010 WL 1729711, at *7 (E.D. Cal. Apr. 28, 2010) ("Information regarding [on] whose behalf the servicer is accepting loan payments seems to clearly be related to the servicing of plaintiff's loan and a proper subject of a QWR under RESPA.").

RESPA's definition of servicing narrowly focuses on the exchange of "payments" between a servicer and a borrower.  12 U.S.C. § 2605(i)(3).  Under this definition, inquiries about the holder of a mortgage note do not pertain to "servicing," because they do not concern the receipt and processing

of mortgage payments.  Furthermore, both RESPA and Regulation X include separate provisions that

lay out servicers' obligations to respond to requests concerning the identity of the owner of the note.

12 U.S.C. § 2605(k)(1)(D) (describing "servicer prohibitions … in general"); 12 C.F.R. §

1024.36(d)(2)(i)(A) (providing that a servicer must respond "within 10 business days to a request

from a borrower to provide the identity, address, and other relevant contact information about the

owner or assignee of the loan.").  The Court concludes, therefore, that the Tanasis' request for

information concerning the owner of their note did not relate to "servicing" and did not trigger

CitiMortgage's liability under section 2605(e).  Because the Tanasis have not sufficiently alleged that

CitiMortgage received QWRs relating to "servicing" on their behalf, the Court dismisses their claim

under section 2605(e) of RESPA.

### b.  CitiMortgage's Liability under Regulation X

#### i.  Liability under 12 C.F.R. § 1024.36 for Failure to Respond to RFIs

The Tanasis allege they sent many requests for information ("RFIs") to CitiMortgage and

that CitiMortgage failed to properly respond to these requests.  Specifically, the Tanasis allege that

they requested information by mail about the following:

> [A]lleged investor restrictions, evidence that CitiMortgage submitted waiver requests, and evidence of CitiMortgage's efforts to obtain a waiver of investor restrictions." *See* Compl. at ¶ 40 (referring to the March 16, 2016 request).

> [T]he owner/assignee of the loan, the servicer's participation in HAMP and the national mortgage settlement, and the parameters of loan modification programs." *Id.* at 41 (referring to the March 30, 2016 request), and

> [B]roker prices opinions and appraisals … to see if CitiMortgage was engaging in any meaningful loss mitigation review.

*Id.* at ¶ 42 (referring to the May 11, 2016 request).

They allege that CitiMortgage failed to respond to most of the requests, and improperly

responded to the March 23, 2016 request with a statement that the information was

"privileged."  *Id.* at ¶ 40.  CitiMortgage argues that it properly invoked the exception for

"privileged" information and that the information the Tanasis sought was irrelevant and did not trigger their duties to respond.  Opp. Mem., 18.

The Court agrees with the Tanasis.  Their claims regarding CitiMortgage's failure to respond to RFIs survive this motion to dismiss, except to the extent that the Tanasis sought information regarding loan modification programs.[6]

Regulation X obligates a servicer, "within five days … of receiving an information request from a borrower," to acknowledge the request and provide a "reasonable" response. 12 C.F.R. § 1024.36.  A mortgage servicer, however, is not obligated to comply with disclosure requirements if it "reasonably determines that the information sought by the borrower is confidential, proprietary, privileged, or irrelevant to the borrower's mortgage account." 12 C.F.R. § 1024.35(e) ("If a servicer withholds documents relied upon because it has determined that such documents constitute confidential, proprietary or privileged information, the servicer must notify the borrower of its determination in writing within 15 days … of receipt of the borrower's request for such documents"). Regulation X also provides that a "QWR that requests information relating to the servicing of the mortgage loan is a request for information for purposes of this section," meaning that "a servicer must comply with all requirements applicable to a request for information." 12 C.F.R. § 1024.36(a).

A servicer's obligations to respond to RFIs are broader than its obligations under RESPA to respond to QWRs, in that a RFI does not need to relate to "servicing." *Mortgage Servicing Rules*, 78 FR 10696 at 10761 ("the final rule . . . does not limit information requests to those related to servicing"). The request, however, may not seek "[i]rrelevant information," meaning that the "the information requested [must be] directly related to the borrower's mortgage loan account."  12 C.F.R. 1024.36(f)(1)(iii).  The CFPB's official guidance gives several examples of irrelevant information:

---

[6] The Tanasis also allege that their two QWRs, each of which sought a payoff statement and the identity of the owner of their mortgage, triggered Regulation X's response obligations under section 1024.36.  CitiMortgage responds that these requests were not related to the "servicing of the loan," making this section inapplicable.  As the Court has concluded that these requests did not relate to servicing, it does not engage with this argument again.

i.  Information that relates to the servicing of mortgage loans other than a borrower's mortgage loan, including information reported to the owner of a mortgage loan regarding individual or aggregate collections for mortgage loans owned by that entity;

ii.  The servicer's training program for servicing personnel;

iii.  The servicer's servicing program guide; or

iv.  Investor instructions or requirements for servicers regarding criteria for negotiating or approving any program with a borrower, including any loss mitigation option.

12 C.F.R. § Pt. 1024, Supp. I, Interpretation of 1024.26(f)(1)(iii).

CitiMortgage argues that the Tanasis sought "irrelevant information" when they requested information about "available loan modification programs." CitiMortgage's Mot., 17. The Court agrees. Given the CFPB's suggestion that "[i]nvestor instructions or requirements for servicers regarding criteria for negotiating or approving any program with a borrower, including any loss mitigation option," are "irrelevant" under Regulation X, the Tanasis' request for "alleged investor restrictions," evidence that CitiMortgage submitted waiver requests of these restrictions, and "the parameters of loan modification programs" are "irrelevant" and do not trigger CitiMortgage's liability. *See* Compl. at ¶¶ 40-41. (referring to the March 16, 2016 and March 30, 2016 requests). Similarly, the Tanasis' request for "broker prices opinions and appraisals … to see if CitiMortgage was engaging in any meaningful loss mitigation review," *id.* at ¶ 42 (referring to the May 11, 2016 request), generally seeks information on CitiMortgage's "criteria for negotiating or approving" loan modification applications and does not trigger CitiMortgage's duty to respond.

CFPB's own guidance supports this conclusion and separately refers to "the new [section] 1024.36, which will require servicers to respond to information requests, and new [section] 1024.38(b)(2)(i), which requires servicers to maintain policies and procedures that are reasonably designed to ensure that servicers provide accurate information regarding loss mitigation options available to a borrower." *Mortgage Servicing Rules*, 78 FR 10696-01 at 10799. Because Regulation X contains a separate section to regulate the mortgage modification process, loan modification

39

information does not properly fall within Regulation X's definition of an RFI. *See Ditto v. JPMorgan Chase Bank, N.A.*, No. 16-81017-CIV, 2017 WL 213969, at *3 (S.D. Fla. Jan. 17, 2017) (collecting cases and agreeing "with the[ir] reasoning and conclusions … [and holding] that a request for loan modification information does not trigger an obligation to respond by operation of 12 C.F.R. § 1024.36(d)(2)(i)(B) and 12 U.S.C. § 2605(k)(1)). The Tanasis' claims under 12 C.F.R. 1024.36 are dismissed to the extent that the alleged requests for information concerned loan modification programs. For that reason, the Court need not evaluate whether CitiMortgage properly invoked the section 36(f)(1)(ii)'s exception for "privileged" information when responding to the Tanasis' March 23, 2016 request.

The Court, however, notes that some of the Tanasis' requests concerned the "owner/assignee" of their note. *See* Compl. ¶ 41 (referring to the March 30, 2016 request), *id.* at ¶ 21 (January 13, 2014), and *id.* at ¶ 34 (March 5, 2015). CitiMortgage was obligated to respond to these requests. Furthermore, there is no evidence that CitiMortgage "acknowledged" the Tanasis' RFIs within Regulation X's five-day window, making dismissal of the Tanasis' claim under 12 C.F.R. § 1024.36 inappropriate. *See* 12 C.F.R. § 1024.36. The Tanasis' claims under 12 C.F.R. § 1024.36 are not dismissed, except to the extent that they relate to the Tanasis' efforts to seek information about loan modification programs.

### ii. Liability under 12 C.F.R. § 1024.35 for Failure to Respond to NOEs

The Complaint alleges that CitiMortgage failed to respond properly to two of the Tanasis' notices of error ("NOEs"). On May 12, 2016, the CitiMortgage allegedly received a notice of error from the Tanasis "stating that it was an error for [CitiMortgage] to fail to:

(i)     provide evidence of its efforts to waive investor restrictions;
(ii)    provide information about its servicer participation agreement for [the Home Affordable Modification Program] and its compliance with the National Mortgage Settlement;
(iii)   acknowledge Plaintiff's RFIs;
(iv)    provide information about Plaintiffs' current loss mitigation options; and

40

(v)      provide income requirements for proprietary loan modification.

Compl. ¶ 43; *see id.* at ¶ 44 (alleging that CitiMortgage's response was deficient).  The Tanasis also allege that they mailed additional notices of error to CitiMortgage on July 6 and July 9, 2015, asserting that CitiMortgage had failed to respond to the Tanasis' questions about loss mitigation options under the HAMP program, the "National Mortgage Settlement Modification" program, and various proprietary modification programs. *Id.* at ¶ 45.  CitiMortgage did not respond. *Id.*

Section 1024.35 of Regulation X "allows borrowers to notify mortgage servicers of possible account errors." 12 C.F.R. § 1024.35.  This section requires servicers to respond to "any written notice from the borrower that asserts an error and that includes … information that enables the servicer to identify the borrower's mortgage loan account, and the error the borrower believes has occurred." 12 C.F.R. § 1024.35(a).  As both parties acknowledge, the regulation only applies to the "covered errors" listed in § 1024.35(b).  Section 1024.35(b) contains a "catch all provision," which applies to "any other error relating to the servicing of a borrower's mortgage loan." 12 C.F.R. § 1024.35(b)(11).  Opp. Mem., 18-19.

The "failure to provide accurate information to a borrower regarding loss mitigation options and foreclosure, as required by 12 C.F.R. 1024.39," is a "covered error." 12 C.F.R. 1024.35(b)(7). The specific section of Regulation X referenced in subsection (b)(7) requires a servicer to, within 45 days of a borrower's delinquency, send the "delinquent borrower a written notice … providing a brief description of examples of loss mitigation options that may be available from the servicer."  12 C.F.R. § 1024.39.  The CFPB has observed that "it is critical for borrowers to have information regarding available loss mitigation options and requiring that a servicer comply with error resolution procedures as to a borrower assertion that a servicer failed to provide such information is important to ensure that borrowers receive this information." *Mortgage Servicing Rules*, 78 FR 10696-01 at 10742.

Courts have concluded that notices of errors in the processing of loss mitigation applications are not "covered errors" within the scope of 1024.35(b). *See Sutton v. CitiMortgage, Inc.*, --- F. Supp. ---, No. 16 CIV. 1778 (KPF), 2017 WL 122989 (S.D.N.Y. Jan. 12, 2017) at *13 ("RESPA (through Regulation X) regulates many aspects of loss mitigation practices, but does not regulate the correctness of a loss mitigation decision, and certainly does not encompass errors in loss mitigation decisions within the catch-all provision in the definition of 'covered errors.'"); *Bracco v. PNC Mortgage*, No. 8:16-CV-1640-T-33TBM, 2016 WL 4507925, at *4 (M.D. Fla. Aug. 29, 2016) (notices of error pertaining to loss mitigation requirements not actionable, because "[a]lthough [the plaintiff] may be correct that 'there is no one else but a servicer to direct inquiries about how badly botched an attempted loan modification was,' Regulation X's requirements governing a servicer's response to loss mitigation applications are found in § 1024.41, not in § 1024.36(c).").

The Tanasis, however, allege that they notified CitiMortgage of its failure to provide information about loss mitigation options, not about its failure to properly process their loss mitigation applications. The Tanasis allege that they mailed two notices of error to CitiMortgage stating that it had failed to provide information relating to loss mitigation options. They do not allege that CitiMortgage provided loan modification information within forty-five days of the Tanasis becoming delinquent on their loan, as required by section 1024.39, and therefore they have adequately stated a claim under sections 1024.35(b)(7) and (b)(11) of Regulation X.

### c.  Damages under RESPA

CitiMortgage argues that the Tanasis "fail to sufficiently allege actual or statutory damages" under RESPA, meriting dismissal of their RESPA claim. CitiMortgage's Mot., 11. CitiMortgage asserts that the Complaint provides only "conclusory factual allegations establishing how [the Tanasis] were harmed by CitiMortgage's alleged RESPA and Regulation X violations," given that "neither the foreclosure judgment nor Plaintiffs' legal expenses in opposing the foreclosure could have been caused by any alleged failure on the part of CitiMortgage to timely review or respond to

Plaintiffs' loss mitigation applications, loss mitigation appeals, RFIs, QWRs or notices of error." *Id.* at 13.  The Tanasis respond that they have adequately pled damages that were proximately caused by CitiMortgage's violations.  Opp. Mem., 15.  The Court agrees with the Tanasis.

The Tanasis argue that CitiMortgage's RESPA violations caused a variety of pecuniary harms, including costs related to stripping the Property of equity (Compl. ¶ 61), unnecessary costs of maintaining the Property due to delayed foreclosure (*id.* at ¶ 62), postage costs for applications and requests for information (*id.* at ¶ 63), creating a public record of foreclosure (*id.* at ¶ 64), and "emotional trauma" (*id.* at ¶ 65).  The Tanasis also claim that CitiMortgage is liable for statutory damages of up to $2,000 for a pattern or practice of RESPA violations (*id.* at ¶ 97).

As a general matter, section 2605 provides for damages "as a result of [the loan servicer's] failure" to comply with its provisions. 12 U.S.C. § 2605(f).  For this reason, a plaintiff seeking actual damages under § 2605 must allege that the damages were proximately caused by the defendant's violation of RESPA."  *See In re Griffin*, No. 10-22431-RDD, 2010 WL 3928610, at *4 (Bankr. S.D.N.Y. Aug. 31, 2010) ("[S]imply saying that, for example, the servicer's failure to respond to a QWR caused damages without specifying how those damages were caused," is not enough to survive a motion to dismiss); *see also Martini v. JPMorgan Chase Bank, N.A.*, 634 F. App'x 159, 164 (6th Cir. 2015) ("Even if we assume, arguendo, that Chase violated RESPA and that the Martinis' letters qualified as QWRs, the Martinis fail to adequately plead the required associated damages [because they] allege damages that are due to their inability to pay their mortgage, not the alleged RESPA violation.").

### i.   Emotional Distress Damages

Damages for a violation of RESPA are defined in section 2605(f) to include "any actual damages to the borrower as a result" of the violation as well as "any additional damages in the case of a pattern or practice of non-compliance." 12 U.S.C. § 2605(f)(1)(A) & (B).  The statute does not define "actual damages," and some courts have interpreted the phrase to allow for emotional distress

damages.  *In re Residential Capital, LLC*, 513 B.R. 446, 464-65 (Bankr. S.D.N.Y. 2014) ("Of the circuits that have addressed the issue, two have indicated that emotional distress damages should be allowed, while no circuit appears to have ruled that emotional damages are *not* allowed.").

Courts, however, have disallowed RESPA claims for emotional distress that are "conclusory and unsupported" and therefore "fail as a matter of law."  *Kilgore*, 89 F. Supp. 3d at 539-40 (dismissing as conclusory the plaintiff's assertions that he "suffered financial loss and severe mental anguish and emotional distress of facing the loss or possible loss of his home through foreclosure"); *see also Sutton*, 2017 WL 122989, at *16 ("Plaintiff's claim to have paid more in mortgage payments than in rent is speculative, inasmuch as there is no allegation in the FAC of any rental opportunity that Plaintiff forwent in favor of continued mortgage payments.").

The Tanasis' claims for emotional distress damages are limited by RESPA's causation requirement.  *See Sutton*, 2017 WL 122989, at *16 ("Plaintiff cannot disentangle the distress that was occasioned by the loan modification into which she voluntarily entered from that which may have been occasioned by Defendant's failure to respond fully to any of her requests for information or to modify the term of the mortgage, and for this reason has not alleged actionable emotional distress damages."); *Roth*, 2013 WL 5205775, at *8 ("Even if plaintiff and her husband suffered emotional distress from the possible loss of their home, plaintiff has not alleged that this injury was proximately caused by defendant's failure to comply with RESPA, i.e., the form and timing of its response to plaintiff's letters."), *aff'd on other grounds*, 756 F.3d 178 (2d Cir. 2014).

In *Residential Capital*, the court observed that RESPA required the plaintiff to "separate the emotional distress resulting from the failure to respond to the QWR from the emotional distress due to the foreclosure action," and that he "face[d] an uphill battle in demonstrating causation and damages."  *In re Residential Capital*, 513 B.R. at 466.  Nevertheless, the court recognized the importance of allowing emotional distress damages under RESPA, even for expenses that paled in comparison to the costs of foreclosure.  *Id.* at 465 (concluding that "the consumers' interests at stake

44

in RESPA warrant a consumer-oriented interpretation of 'actual damages' to allow for emotional distress damages in appropriate cases," and recognizing that the information sought by borrowers in QWRs "is not trivial").

To support their claim for damages relating to "emotional trauma," the Tanasis cite a study that describes the physical and psychological impact of the foreclosure process on borrowers. Compl. at ¶¶ 139-40.  These allegations do not "separate the emotional distress resulting from the alleged RESPA violations from the emotional distress due to the Foreclosure Action." *In re Residential Capital*, 513 B.R. at 466.  The study reports a correlation between being "two months behind on mortgage payments" and "significant health issues," including "major depression." Compl.¶ 140.  The Tanasis do not, however, allege that CitiMortgage's failure to respond to their requests for information or otherwise comply with RESPA caused them to fall behind on mortgage payments.

The Tanasis nevertheless provide a plausible theory of causation.  They allege that CitiMortgage failed to respond to their inquiries about the servicing of their loan, leading to frustration and unnecessary stress during the foreclosure process.  Given RESPA's interest in "providing consumers with greater and more timely information," the Court cannot conclude that these costs are insignificant. *Cohen v. JP Morgan Chase & Co.*, 498 F.3d 111, 122 (2d Cir. 2007) (citing 12 U.S.C. § 2601(a)).  While the Tanasis may have difficulty proving that they suffered emotional distress caused by CitiMortgage's violations, rather than the foreclosure itself, *see In re Residential Capital*, 513 B.R. at 466, they have stated a claim for emotional distress damages under RESPA

### ii.   Postage Costs

The Tanasis also claim damages relating to "postage costs for applications and requests for information."  Compl. ¶ 63.  Once again, a plaintiff seeking actual damages under § 2605 must allege that the damages were proximately caused by the defendant's violation of RESPA.  *Gorbaty*, 2014

U.S. Dist. LEXIS 135513 at *5 ("Gorbaty's Complaints contain only conclusory allegations that she has suffered actual damages, and no factual allegation suggesting that any damages she suffered were proximately caused by Wells Fargo's violations of § 2605").  Costs incurred after an incomplete or insufficient response are recoverable under RESPA, but "costs incurred before the violation occurred, such as the expenses of preparing an initial request for information, cannot serve as the basis for actual damages." *Pimental v. Ocwen Loan Servicing, LLC*, No. 16-CV-62089, 2016 WL 6678523, *5-6 (S.D. Fla. Nov. 8, 2016); *see also Zeich v. Select Portfolio Servicing, Inc*., No. 15-1005, 2015 U.S. Dist. LEXIS 151519, at *5 (D. Or. Oct. 30, 2015) ("[T]o the extent plaintiff incurred fees for postage, he cannot recover for mailing the qualified written request itself."); *cf. Marais v. Chase Home Fin. LLC*, 736 F.3d 711, 720 (6th Cir. 2013) (remanding the district court's "determination that costs Marais incurred associated with preparing her QWR did not constitute actual damages," because it "did not take into account Marais's argument that those costs were for naught due to Chase's deficient response.").

The Tanasis, therefore, can only claim compensatory damages that relate to costs that they incurred after CitiMortgage allegedly failed to respond to their requests for information.  They cannot recover for costs related to "preparing" and "submitting requests for information," Compl. ¶ 63, to the extent that these costs involve the Tanasis' initial requests for information.  The Tanasis would have incurred these costs regardless of CitiMortgage's alleged violations.  Accordingly, Defendants' motion to dismiss is granted with respect to the Tanasis' claim for compensatory damages relating to their preparation of their initial request for information, but not for damages stemming from the preparation of later requests, or of notices of error that they would not have needed to prepare but for CitiMortgage's alleged violations.

### iii.  Miscellaneous Damages

The Tanasis also allege that CitiMortgage's RESPA violations caused harm in the form of "costs related to stripping the Property of equity," "unnecessary costs of maintaining the Property

due to delayed foreclosure," and the creation of a "public record of foreclosure."  *See* Compl. ¶¶ 61-65.  The Tanasis explain that they were "injured by their pursuit of an unavailable [mortgage] modification," *id.* at ¶ 133, and that CitiMortgage's violations unnecessarily delayed their foreclosure.  *Id.*  Even when read in the light most favorable to the Tanasis, the Complaint does not allege that CitiMortgage's failure to respond to its requests for information caused a delayed mortgage.  These damages do not "plausibly flow" from CitiMortgage's alleged violations, *Gorbaty*, 2012 WL 1372260 at *6, given that the Tanasis' RESPA claims concerning loss mitigation have been dismissed.  Accordingly, this aspect of the Tanasis' damages claim is also dismissed.

### iv.  Statutory Damages

Finally, the Tanasis claim that they are entitled to statutory damages because of CitiMortgage's pattern or practice of RESPA violations.  Compl. ¶ 96.  CitiMortgage argues that statutory damages are inappropriate because the Tanasis fail to allege actual damages under RESPA. CitiMortgage's Mot., 13. Because the Tanasis have stated a claim for actual damages under RESPA, the Court does not address this argument.  The Tanasis have stated a claim for statutory damages.

To obtain statutory damages, a plaintiff must establish "a pattern or practice of noncompliance" with RESPA. 12 U.S.C. § 2605(f)(1). "Pattern or practice means a standard or routine way of operating." *Gorbaty*, 2012 WL 1372260, at *5 (citation and internal quotation marks omitted).  Although there is no set number of violations needed to plead "a pattern or practice of noncompliance," "courts have held that two violations of RESPA are insufficient to support a claim for statutory damages." *Kapsis v. Am. Home Mortg. Servicing Inc*., 923 F. Supp. 2d 430, 449 (E.D.N.Y. 2013); *see also Fournier v. Bank of Am. Corp.*, No. 5:13-CV-00702, 2014 WL 421295, at *4 (N.D.N.Y. Feb. 4, 2014) ("In light of Plaintiff's allegation that 'Defendants are regularly engaged in the servicing of residential mortgages,' … three instances of noncompliance with RESPA is insufficient to establish a pattern or practice of noncompliance, particularly where Defendants responded to Plaintiff's fourth alleged QWR in a timely manner."); *Lage*, 145 F. Supp. 3d at 1193

47

(dismissing pattern or practice allegations when the plaintiff referred only to an "unidentified action taken by the New York Department of Financial Services and the CFPB," and provided "[n]ot so much as a case or reference number.").

The Tanasis use the CFPB's publicly accessible database to allege that the Bureau has received "3,100 complaints against CitiMortgage." Compl. ¶ 90. They cite some of these complaints, all of which concern CitiMortgage's failure to respond to loss mitigation applications. *Id.* at ¶¶ 91-93. Citing the complaints in two cases filed against CitiMortgage in other federal courts, they also allege that CitiMortgage routinely fails to respond to QWRs from borrowers. *Id.* at ¶ 95. Accordingly, they sufficiently state a claim for statutory damages under RESPA.

### 2.   The Tanasis' Negligence Claims

In their second cause of action, the Tanasis claim that CitiMortgage is liable for negligence and negligent infliction of emotional distress. Compl. ¶¶ 102-138. They allege that CitiMortgage breached its duties under RESPA and Regulation X by failing to request a waiver of Hudson's loan modification restrictions, providing improper and inaccurate information to borrowers, and failing to timely provide the Tanasis with a single point of contact as required by a consent decree. Compl. ¶¶ 108-15, 118-27.

### a.   CitiMortgage's Duty of Care, Generally

CitiMortgage alleges that it owed no duty to the Tanasis and did not proximately cause the Tanasis' alleged injuries. CitiMortgage's Mot., 22. The Tanasis respond that Defendants' duty stemmed from RESPA and Regulation X and the "public policy" that those rules represent, and that they have suffered "foreseeable harm." Opp. Mem., 27. The Court agrees with the Tanasis.

"[T]he existence of a duty of care is an essential element of negligence." *Pelletier v. Sordoni/Skanska Construction Co.*, 286 Conn. 563, 578(2008). "A duty to use care may arise from a contract, from a statute, or from circumstances under which a reasonable person, knowing what he

48

knew or should have known, would anticipate that harm of the general nature of that suffered was likely to result from his act or failure to act." *Id.* (internal quotation marks omitted.).

Statutes and regulations can establish a duty of care that can form the basis of a negligence action. *Small v. S South Norwalk Savings Bank*, 205 Conn. 751, 760, 535 A.2d 1292 (1988). ("Where a statute is designed to protect persons against injury, one who has, as a result of its violation, suffered such an injury as the statute was intended to guard against has a good ground of recovery.") (internal citations omitted). "Statutory negligence is actionable upon satisfaction of two conditions: (1) the plaintiff must be a member of the class protected by the statute; and (2) the injury must be of the type the statute was intended to prevent." *Id.*

In *Small*, the court recognized that a statute establishing requirements for federally-approved lenders could establish a common law duty to comply with the statute and its implementing regulations, even if the statute did not include a private right of action. *Id.*; *see also Shamber*, 2009 WL 4282900 (allowing RESPA to be the basis of a claim for statutory negligence). In *Shamber*, the court held that a foreclosure defendant had "appropriately pleaded a claim for statutory negligence" based on RESPA because he was a member of the class protected by RESPA— "consumers/borrowers"—and his alleged injuries are of the type that RESPA was intended to prevent; namely, "late fees and damage to a consumer's credit." *Id.* at *12.

The Tanasis allege that CitiMortgage owed a duty of care under RESPA, Regulation X, and the National Mortgage Settlement ("NMS"), a consent decree between CitiMortgage, the federal government, and 49 states' attorneys general. *Id.* at ¶ 99. At this stage in the litigation, the Court cannot determine that CitiMortgage did not owe a duty to the Tanasis, who are members of the class of consumers that Congress sought to protect by enacting RESPA.

### b. Negligent Infliction of Emotional Distress

CitiMortgage also argues that the Tanasis fail to state a negligence claim because they "cannot claim that CitiMortgage's conduct was the cause of their harm," CitiMortgage's Mot., 26,

and therefore, their claim for negligent infliction of emotional distress should be dismissed.  *See id.*
The Court disagrees.

To prevail on a claim of negligent infliction of emotional distress, a plaintiff must prove the
following elements: "(1) the defendant's conduct created an unreasonable risk of causing the plaintiff
emotional distress; (2) the plaintiff's distress was foreseeable; (3) the emotional distress was severe
enough that it might result in illness or bodily harm; and (4) the defendant's conduct was the cause of
the plaintiff's distress." *Carrol v. Allstate Ins. Co*., 262 Conn. 433, 444 (2003).  If the alleged distress
is "unreasonable in light of the [defendant's] conduct, the defendant would not have recognized that
their conduct could cause this distress and, therefore, [are] not liable" for negligent infliction of
emotional distress.  *Larobina v. McDonald*, 274 Conn. 394, 410 (2005) (internal quotation marks
omitted).

Connecticut courts have recognized negligent infliction of emotional distress claims based on
contracts that create "rigorous expectation[s] for contractual performance." *Murphy v. Lord
Thompson Manor, Inc*., 105 Conn. App. 546, 554, *cert. denied*, 286 Conn. 914 (2008).  While some
Connecticut courts conclude otherwise, "courts in this district have held that a claim for negligent
infliction of emotional distress can arise in relation to the service of a mortgage." *Drena v. Bank of
Am.*, N.A., No. 3:15-CV-00176 (MPS), 2016 WL 730699, at *6 (D. Conn. Feb. 23, 2016) (citing
*Holtman v. Citifinancial Mortgage Co.*, No.. 3:05-CV-1571, 2006 WL 1699589 (JCH), (D. Conn.
June 19, 2006); *but see Vaccaro v. U.S. Bank, N.A*., No. CV146050373S, 2016 WL 8488123, at *9
(Conn. Super. Ct. Nov. 8, 2016) (concluding that allegations that defendant bank "attempted to
enforce the note in the foreclosure action even though it knew or should have known that it was not
the holder of the note," did not "[give] rise to a duty"); *Leonardo v. Ultimate Brands, Inc*., No.
CV085024048S, 2009 WL 3644683, at *2 (Conn. Super. Ct. Sept. 18, 2009) (plaintiff failed to meet
"duty element" of NIED claim when her "central allegation" was that the defendant attempted to

enforce the note in the prior foreclosure action, even though it "knew or should have known" that "the plaintiffs had valid defenses").

In *Drena*, the court denied the defendant's motion to dismiss a negligent infliction of emotional distress claim when the plaintiff alleged that the defendant "improperly debited payments from his bank account, represented to him that it would promptly work with him to avoid foreclosure but instead delayed a loan modification application, did not process the documents that it repeatedly requested, and initiated a foreclosure action." *Drena*, 2016 WL 730699 at *6 ("[I]t is foreseeable that taking unauthorized funds from a mortgagor who already is struggling to pay his mortgage, and then stringing along the mortgagor for years by repeatedly requesting and repeatedly ignoring the mortgagor's loan-modification paperwork would be severely distressing to a mortgagor in financial straits striving to stay in his home.").  Similarly, in *Holtman*, the plaintiff's negligent infliction of emotional distress claim was sufficient when the plaintiff alleged that a mortgagee erroneously charged late fees, contacted a third party about the allegedly untimely payments, made hundreds of telephone calls at the mortgagors' home and office, claimed that "'an attorney would come out on Monday and put a padlock on the door' if the Holtmans did not make payments, even though such payments were not actually due." *Holtman*, 2006 WL 1699589, at *1.

The Tanasis' remaining negligence claims concern CitiMortgage's negligent provision of a single point of contact and solicitation of mortgage modification applications. The Tanasis allege that this negligence caused "years of duress," and resulted in their "emotional trauma."  Opp. Mem., 33. Specifically, they allege that the foreclosure process exposes mortgagors to "extraordinary stressors," that have a physical and psychological impact.  Compl. ¶¶ 139-40.  As the Court noted above, the Tanasis must eventually show that their claimed emotional distress flows from Defendants' negligent processing of their mortgage, rather than the Foreclosure Action itself.  Nevertheless, the Tanasis have alleged damages that could plausibly result from Defendants' negligence, and their claim shall not be dismissed now.

### 3.   The Tanasis' CUTPA Claims

The Tanasis also claim that Defendants violated CUTPA by improperly evaluating their loss mitigation applications, repeatedly requesting duplicative or unnecessary information, soliciting them to apply for loan modifications for which they were not eligible, and improperly charging fees and interest.  Compl. ¶ 149.  Defendants argue that these claims are legally insufficient because the Tanasis have not alleged that Defendants were "either immoral, unethical, unscrupulous or offensive to public policy."  CitiMortgage.'s Mot., 29.  The Court disagrees.

CUTPA provides that "no person shall engage in unfair methods of competition or deceptive acts or practices in the conduct of any trade or commerce." Conn. Gen. Stat. 42-110b. In order to prevail on a CUTPA claim, a plaintiff must plead that: "(1) the defendant was acting in trade or commerce; (2) that the defendant engaged in unfair or deceptive acts; and (3) that such unfair or deceptive acts cause the plaintiff to suffer an ascertainable loss."  *Id.* "Connecticut courts have held that CUTPA applies to unfair or deceptive conduct by mortgage companies and other holders of mortgage notes." *Rodrigues v. J.P. Morgan Chase Bank*, No. 3:08-CV-1417 (PCD), 2009 WL 3710688, at *9 (D. Conn. Nov. 3, 2009).

### a.   Unfair Business Practice

To determine whether a business practice violates CUTPA, Connecticut courts follow the Federal Trade Commission's "cigarette rule," and evaluate whether a defendant's conduct: (1) offends public policy as it has been established by statutes, the common law, or otherwise; (2) is immoral, unethical, oppressive, or unscrupulous; or (3) causes substantial injury to consumers or other businesses." *Web Press Serv. Corp. v. New London Motors, Inc.*, 203 Conn. 342, 355 (1987).

Connecticut courts have held that misrepresentations by a mortgage company are actionable under CUTPA, and that federal housing and lending statutes can demonstrate a "public policy" as required by the Act.  *See Davis v. Jacobson*, No. 3:12-CV-1102 (JBA), 2014 U.S. Dist. LEXIS 157693, at *13-14 (D. Conn. Nov. 7, 2014) ("Plaintiffs have plausibly alleged that Wells Fargo's

conduct in wrongfully pursuing the remedy of foreclosure in breach of the parties' forbearance agreement constitutes unethical, oppressive, or unscrupulous behavior under CUTPA"); *Rey*, 150 Conn. App. at 599 ("[T]here are reasons well-grounded in public policy and consistent with the equitable nature of foreclosure, to find that a mortgagee who enters into a forbearance agreement during foreclosure litigation with a qualified residential borrower should not be permitted to pursue the remedy of foreclosure when the borrower has fully complied with its terms."); *see also Bartold v. Wells Fargo Bank, N.A.*, No. 14-CV-00865 (VAB), 2015 WL 7458504, at *6 (D. Conn. Nov. 24, 2015) (denying motion to dismiss CUTPA claim when the defendant, a bank, was "alleged to have repeatedly given Plaintiff false information in response to Plaintiff's inquiries, used those false representations to coerce Plaintiff to accept less money than he was owed, and then after the misrepresentation was finally disproven[,] refused to correct its error.").

The Tanasis have alleged that Defendants were reckless and deceptive in their solicitation of mortgage modification agreements, causing additional costs, fees, and frustration for consumers. They also allege that CitiMortgage's confusing and deceptive communications with vulnerable borrowers violated an important public policy. The Tanasis' CUTPA claims are sufficient at this stage of the litigation.

### b. The Tanasis' Ascertainable Loss under CUTPA

Defendants further argue that the Tanasis' emotional distress damages are not recoverable under CUTPA. Def.'s Supp. Briefing (citing *Rodrigues*, 3009 WL 3710688 at *10 and *Deutsche Bank v. Lichtenfels*, 2009 WL 2230937 at *1-*3 (Conn. Super. June 17, 2009)). The Tanasis respond that emotional distress damages are available under CUTPA once a plaintiff satisfies the threshold "ascertainable loss" inquiry. Pl.'s Supp. Briefing, 1. The Court agrees with the Defendants, but notes that the Tanasis have satisfied CUTPA's "ascertainable loss" requirement by claiming other damages.

To prevail on a CUTPA claim, a plaintiff must prove that the defendant engaged in "unfair or deceptive acts or practices in the conduct of any trade or commerce" and that as a result of the act or practice, the plaintiff suffered an "ascertainable loss of money or property." *D'Angelo Development & Construction Corp. v. Cordovano*, 121 Conn. App. 165, 181, *cert. denied*, 297 Conn. 923 (2010). The ascertainable loss requirement is a "threshold barrier which limits the class of persons who may bring a CUTPA action seeking either actual damages or equitable relief." *Di Teresi v. Stamford Health Sys.*, 149 Conn. App. 502, 508 (2014) (internal citations omitted).

In *DiTeresi*, the court interpreted CUTPA's ascertainable loss requirement to necessitate "actual monetary or physical loss," concluding that claims of emotional damages, alone, would not trigger liability. *DiTeresi*, 149 Conn. App. at 510 ("Although our appellate courts have not yet had the opportunity to address whether emotional distress, by itself, constitutes an ascertainable loss under CUTPA, our Superior Court [has] continued to hold that emotional distress is not sufficient for purposes of CUTPA."); *see also Larobina v. Wells Fargo Bank, N.A.*, 632 F. App'x 55, 56-57 (2d Cir. 2016) (approving of summary judgment for the defendant when the CUTPA plaintiff had claimed only emotional distress, and holding that "although the Connecticut Supreme Court has not ruled on the question, [state appellate] precedents allow us to predict with confidence that Connecticut's highest court would reach the same outcome") (citing *DiTeresi*, 149 Conn. App. at 512).

A party seeking to recover damages under CUTPA must "present evidence providing the court with a basis for a reasonable estimate of the damages suffered [, but this] does not necessitate that the actual amount of ascertainable loss be proven." *Reader v. Cassarino*, 51 Conn. App. 292, 299, 721 A.2d 911 (1998). In other words, the Tanasis do not need to "prove a specific amount of actual damages in order to make out a prima facie case." *Hinchliffe v. Am. Motors Corp.*, 184 Conn. 607, 612-13 (1981). Furthermore, they do not need to claim significant damages. Under CUTPA, "the private loss indeed may be so small that the common law likely would reject it as grounds for

54

relief, yet it will support an action under the statute." *Madonna v. Acad. Collection Serv., Inc*., No. 3:95CV00875 (AVC), 1997 WL 530101, at *11 (D. Conn. Aug. 12, 1997); *Hinchliffe*, 184 Conn. at 617 ("CUTPA provides an action more flexible and a remedy more complete than did the common law.")

The Tanasis "have alleged that they incurred an ascertainable loss in the form of professional fees in attempting to apply for a mortgage modification, attorneys' fees, postage, copying, and other miscellaneous expenses." Pl.'s Supplemental Brief, 2.[7]  These claims are sufficient to state a CUTPA claim.  The *Madonna* court reviewed the claims of a CUTPA plaintiff who pled an ascertainable loss of about $1.00 of postage stamps.  *Madonna*, 1997 WL 530101, at *11. The court concluded that, assuming plaintiff had demonstrated an ascertainable loss, he had established a violation of CUTPA.  *Id.* at n. 8; *see also Rodrigues* 2009 WL 3710688, at *9 (dismissing the CUTPA claims of borrower-plaintiffs "to the extent [that they sought] emotional distress damages," but denying summary judgment on CUTPA claims because plaintiffs alleged "other types of damages" as well).

The Tanasis' claims are insufficient to the extent that they seek damages for emotional distress, but the Tanasis CUTPA claim survives because they have otherwise satisfied the statute's "ascertainable loss" requirement.

### 4.  Statute of Limitations for Negligence and CUTPA claims

CitiMortgage also moves to dismiss both the Tanasis' CUTPA claim and their negligence claims for economic distress, arguing that these claims are time-barred.  CitiMortgage's Mem., 25

---

[7] The Court notes that some of the Tanasis' CUTPA claims are related to CitiMortgage's negligent handling of their mortgage modification applications and have been dismissed under *res judicata*, and reiterates that the Tanasis' CUTPA claim is limited to ascertainable losses stemming from Citimortgage's other allegedly injurious practices— such as the negligent solicitation of mortgage modification applications.  The Court further notes that some of the Tanasis' postage and professional fees relating to requests for information have been disallowed as RESPA damages, and reiterates that these are not the same postage and professional fees that the Tanasis seek to recover in their CUTPA claim, which, presumably, claims losses relating to the preparation of mortgage modification applications that Citimortgage solicited in an allegedly negligent manner.

(citing Conn. Gen. Stat. 52-577).   The Tanasis respond that the statute of limitations is "tolled under the continuing course of conduct doctrine."  Opp. Mem., 24.  The Court agrees with the Tanasis.

As both parties seem to acknowledge, under CUTPA, an action "may not be brought more than three years after the occurrence of a violation."  Conn. Gen. Stat. § 42-110g(f).  Plaintiffs must bring claims for physical or emotional injuries caused by negligence within two years, *id.* at § 52-584, and negligence claims for economic damages within three years.  *Id.* at § 52-577; *see also Rivera v. Double A Transp., Inc.*, 248 Conn. 21, 31 (1999) (concluding in an action for negligent infliction of emotional distress that "mental suffering, even if unaccompanied by physical trauma to the body, constitutes an injury to the person under § 52-584.").

"A statute of limitations may be tolled under the continuing course of conduct doctrine [when the defendant] committed an initial wrong upon the plaintiff," and there is "evidence of [a] breach of a duty that remained in existence after commission of the original wrong."  *Watts v. Chittenden*, 301 Conn. 575, 583 (2011).  This doctrine has been applied to claims under CUTPA.  *See Fichera v. Mine Hill Corp.*, 207 Conn. 204, 209 (1988) (outlining the same test).  If the defendant did not "engage in any additional wrongdoing toward, or have any further contact with" the plaintiff, the doctrine is inapplicable.  *Flannery v. Singer Asset Fin. Co., LLC*, 312 Conn. 286, 306 (2014).  The continuing course of conduct doctrine is "conspicuously fact-bound."  *Blanchette v. Barrett*, 229 Conn. 256, 276 (1994), *overruled on other grounds by Grey v. Stamford Health Sys., Inc.*, 282 Conn. 745 (2007).

The Court has already dismissed the Tanasis' negligence claims to the extent that they apply to negligent handling of loss mitigation applications. The Tanasis' negligence claim therefore is based on CitiMortgage's failure to provide a "single point of contact," and its "continual" solicitation of mortgage modification applications. Compl. ¶¶ 119-127; 132-134.  These allegations, as well as allegations concerning CitiMortgage's "misrepresentations" about its loss mitigation policies, also constitute the Tanasis' CUTPA claim.

56

The Tanasis allege that CitiMortgage owed them a duty under RESPA, Regulation X, and the National Mortgage Settlement.  They allege that CitiMortgage "continually" breached this duty by soliciting and negligently reviewing loss mitigation applications in 2012, 2014, 2015, and 2016, and by negligently providing a point of contact when the Tanasis engaged with CitiMortgage in 2014 and 2016.  *See* Opp. Mem., 25 (citing Compl. at ¶¶ 15, 18, 19, 20, 26, 36, 37). They sufficiently allege that CitiMortgage committed "further misconduct," *Flannery*, 312 Conn. at 313, and engaged in a "numerous and continuous series of events," *Watts*, 301 Conn. at 588, within the last two years.  *See McCullough v. World Wrestling Entm't, Inc.*, 172 F. Supp. 3d 528, 552 (D. Conn.), *reconsideration denied*, No. 3:15-CV-001074 (VLB), 2016 WL 3962779 (D. Conn. July 21, 2016), *and appeal dismissed*, 838 F.3d 210 (2d Cir. 2016) (denying motion to dismiss on statute of limitations grounds when "further factual development [wa]s necessary" to determine the defendant's continuing duty).  At this stage of the litigation, the Tanasis' allegations are sufficient to deny CitiMortgage's motion to dismiss their CUTPA and negligence claims based on the statute of limitations.

### 5.  Defendant M&T Bank

In a single sentence, M&T argues that the Tanasis claims should be dismissed under Rule 12(b)(6) because the Tanasis "have failed to state a cause of action for which M&T can be vicariously liable." M&T's Mem., 11.  The Tanasis respond that M&T does not "contest the imposition of vicarious liability" under RESPA, CUTPA, and negligence, and allege that it is liable for CitiMortgage's conduct under all three causes of action.  Opp. Mem. to M&T's Mot., ECF No. 28, at 3.  The Court agrees.

"[T]raditional vicarious liability rules ordinarily make principals or employers vicariously liable for acts of their agents or employees in the scope of their authority or employment." *Meyer v. Holley*, 537 U.S. 280, 285 (2003) (applying traditional vicarious liability principles to the Fair Housing Act); *Sheltry v. Unum Life Ins. Co. of Am.*, 247 F.Supp.2d 169, 181 (D. Conn. 2003) (Under agency law, "the principal ... is liable for[ ] the acts in which his agent engages with authority from

57

the principal and within the scope of the agent's employment.").  A plaintiff must show "(1) the principal's manifestation of intent to grant authority to the agent, and (2) agreement by the agent." *Commercial Union Ins. Co. v. Alitalia Airlines, S.p.A.*, 347 F.3d 448, 462 (2d Cir. 2003) (citing Restatement (Second) of Agency §§ 15, 26).

An individual has apparent authority to act for a principal when "(1) the principal held the agent out as possessing sufficient authority to embrace the act in question, or knowingly permitted him to act as having such authority, and (2) in consequence thereof the person dealing with the agent, acting in good faith, reasonably believed, under all the circumstances, that the agent had the necessary authority." *Levine v. Advest, Inc*. 244 Conn. 732, 674 (1998). "Apparent authority must be derived not from the acts of the agent but from the acts of his principal."  *Id.* (agent had apparent authority to sign contract on behalf of Yeshiva when "affidavits stated that [Yeshiva] vested [him] with the responsibility of investing the assets held in the scholarship fund," but Yeshiva held the related assets).

The Tanasis have alleged that Hudson delegated to CitiMortgage the authority to change the terms of mortgage loans, waive contract terms, and "take such action as it shall deem to be in the best interest of [Hudson]."  Compl. ¶ 59.  This delegation is broad, and would include the authority to properly communicate with borrowers concerning their mortgages.  Although the Tanasis do not make allegations concerning their perception of CitiMortgage's authority, they imply that they had a "good faith" and "reasonable" belief that CitiMortgage, as the loan servicer and main point of contact for the Tanasis, had the authority to take action on behalf of M&T.  *Levine,* 244 Conn. at 674.  Based on the alleged "acts of the principal," *id*, and the Tanasis' alleged perceptions, the Complaint plausibly alleges that M&T is vicariously liable for CitiMortgage's alleged violations.

The Court notes that RESPA and Regulation X limit liability to "servicer[s]" of qualified mortgages.  *See*, *e.g.* 12 C.F.R. § 1024.35 ("a servicer shall comply with the requirements of this section...."); 12 C.F.R. § 1024.35 (describing obligations of "servicers"); *see also* 12 U.S.C. §

2605(k)(1)(E) ("A servicer of a federally related mortgage shall not ... fail to comply with any other obligation found by the Bureau of Consumer Financial Protection, by regulation, to be appropriate to carry out the consumer protection purposes of this Act.").  Some courts have concluded that defendant mortgage owners cannot be vicariously liable for mortgage servicers under these rules. *Compare Rouleau v. US Bank, N.A.*, No. 14-CV-568-JL, 2015 WL 1757104, at *7 (D.N.H. Apr. 17, 2015) ("[The defendant] has identified no statutory language that would support a conclusion that the ordinary rules of vicarious liability do not apply to RESPA[.]") *and Cruz et al v. Green Tree Mortgage Serv., LLC*, 3:15-cv-00714-AWT, Ruling on Mot. to Dismiss (August 15, 2016), ECF No. 50 ("Had Congress wanted the statute to preclude vicarious liability on the part of makers and holders of loans who do not also service the loans, it could have done so, just as it precluded imposing liability on assignees of creditors under TILA."), *with Hawk v. Carrington Mortg. Servs., LLC*, No. 3:14-CV-1044, 2016 WL 4433665, at *1–2 (M.D. Pa. Aug. 17, 2016) (With one exception, [*Rouleau*,] courts have rejected efforts to expand RESPA liability under § 2605 beyond the limits expressly set by statute, which only governs loan servicers, and impose vicarious liability upon loan holders as well.... We believe that this emerging majority position reflects the better view on this question regarding the scope and reach of RESPA."), *and Bennett v. Nationstar Mortg., LLC*, No. CV 15-00165-KD-C, 2015 WL 5294321, at *11 (S.D. Ala. Sept. 8, 2015) ("[T]he undersigned finds that the provisions of RESPA and Regulation X specify exactly which type of actor is burdened by those provisions.").

As the Tanasis note, M&T does not argue that vicarious liability is impossible under RESPA, but rather that it should not be vicariously liable in this case.  For this reason, the Court does not conclude, at this stage of the litigation, that the Tanasis have failed to state a RESPA claim against M&T.

V.      **Conclusion**

In their Amended Complaint, the Tanasis claimed "tens of thousands of dollars" in damages, arguing that Defendants were liable for their "interest, attorneys' fees, default fees, and other costs relating to foreclosure," the "significant" expenses of preparing mortgage modification applications, and the "embarrassment," "anxiety," and "elevated stress levels for fear of losing their home." *See* Compl. ¶¶ 61-65. These claims have been reduced, however, by the doctrine of *res judicata*. Under *res judicata*, the Court cannot exercise jurisdiction over the RESPA and negligence claims relating to CitiMortgage's allegedly improper processing of the Tanasis' loss mitigation applications.

The Tanasis' claims for emotional distress damages under CUTPA (Count Three) are not actionable, and their claims for emotional distress under RESPA (Count One) and the related negligence action (Count Two) are very limited. The Tanasis' lawsuit is now limited to claims for consequential damages relating to CitiMortgage's response to several of their communications, statutory damages under RESPA, and the yet-to-be-determined, but limited, emotional distress damages flowing from CitiMortgage's alleged violations.

For the reasons stated above, the Defendants' Motions to Dismiss are GRANTED in part and DENIED in part.

SO ORDERED at Bridgeport, Connecticut this 30 day of June 2017.

 _/s/ Victor A. Bolden_____
VICTOR A. BOLDEN
UNITED STATES DISTRICT JUDGE